E. V. BURDETT and O. D. McCULLOH, composing the firm of BURDETT & McCULLOH, Respondents, v. A. M. PARISH, Appellant.

Kansas City Court of Appeals, January 11, 1915.

1. REAL ESTATE BROKERS: Commission. The plaintiffs sued to recover a real estate agent's commission for the sale of the defendant's 360 acre farm. The plaintiffs advertised a farm for sale, and a real estate man from another town exhibited it to a prospective purchaser, who declined to buy this farm. On their way back to town, the plaintiffs told him about defendant's farm, and he entered into a contract to buy it. Afterwards the sale was made and the plaintiffs' commission was not paid. *Held*, that where an agent employed to produce a customer who is ready, willing and able to buy on the terms proposed by the principal, produces a customer whom the principal accepts and with whom he enters into a contract, the agent has earned his commission.

2. ———: ———: ———: Net Price. Where the employment of an agent is not on terms which make his right to recover a commission depend upon his producing a sale at a fixed net sum to his principal, and where the principal makes a sale to a buyer found and introduced by the agent, he cannot escape liability for a commission on the ground that he sold at a less price than that at which he listed the property with the agent.

3. ———: ———: ———: ———. Where an agent takes land to sell for a net price to his principal, he cannot recover any commission unless he sells for more than the net price.

4. ———: ———. But the principal must act in good faith toward his agent and is not allowed, while the agent's authority stands unrevoked, and he is laboring in good faith to make a sale at a price that will give him a commission, to fraudulently or improperly interfere with the agent by selling to the buyer, produced by the agent, at the fixed net price. Such interference will entitle the agent to recover a reasonable commission.

Appeal from Cass Circuit Court.—*Hon. A. A. Whitsett, Judge.*

AFFIRMED.

*A. L. Graves* and *Chas. W. Sloan* for appellant.

*W. D. Summers* and *D. C. Barnett* for respondents.

JOHNSON, J.—This suit was begun August 8, 1913, in the circuit court of Cass county to recover a real estate agent's commisison for the sale of a farm of 360 acres owned by defendant in that county. The petition alleges that plaintiffs were employed by defendant "to find a purchaser for said lands" and that they "procured one Smith Keifer, guardian of Leroy and John Keifer, to become the purchaser of said lands for the aggregate sum of $27,000, being the price of $75 per acre; that the said plaintiffs were the procuring cause in making said sale to said Smith Keifer, guardian as aforesaid, and that they are entitled, as a reasonable compensation for their services in making said sale, to the sum of . . . six hundred and seventy-five dollars, etc."

The answer is a general denial.

A trial of the issues resulted in a verdict and judgment for plaintiffs in the sum of four hundred dollars and defendant appealed.

Plaintiffs were partners as real estate brokers in Garden City and a year or more before the sale in controversy, defendant had listed his farm with them for sale and had listed it with a number of other agents. For a time plaintiffs had been authorized to sell the farm at $80 per acre, but sometime before the sale defendant had authorized a sale at $75 per acre net to him which meant that plaintiffs would have to sell at a higher price to earn a commission. On July 24, 1913, Smith Keifer, who formerly had resided in Oklahoma, but had removed to Osceola in St. Clair county, entered into a written contract with defendant for the purchase of the land at the price of $27,000, for his two minor sons, of whose persons and estates he was guard-

ian and curator. An ancestor of their mother was a
Creek Indian, and they had a separate income from
royalties they received from the sale of rights to ex-
tract oil from lands in Oklahoma they had inherited
from their mother. Jurisdiction of the persons and
estate of the minors was vested in the county court of
Creek county, Oklahoma, and it was necessary for the
guardian to procure an order of that court approving
the investment before he could complete the purchase
of defendant's farm. Consequently it was provided in
his contract with defendant that the contract should
not "take effect until approved by the county court of
Creek county, Oklahoma." Pursuant to other provi-
sions the guardian paid defendant $3000 on the pur-
chase price at the time of signing the contract and it
was provided that if defendant had a good title to the
land and fully performed his part of the contract and
the purchaser failed to comply with the requirements
made of him "within thirty days after being furnished
with the Abstract of Title then the aforesaid deposit
of $3000 shall be forfeited and is to be divided equally
between the seller (defendant) and the real estate
agent or firm whose name appears below, through
whose service this sale and contract has been made."

The contract then proceeded to designate W. L.
Meyers as the agent entitled to the commisison and
fixed his compensation at $687.50 which defendant
agreed to pay "unless said buyer forfeits the above-
named deposit, in which event an equal division of said
forfeit money, as above provided, shall relieve said
seller from the payment of said commission." On the
day following the signing of this contract, Keifer, as
guardian, made formal application to the county court
of Creek county, Oklahoma, for an order authorizing
the investment and approving the contract and such
order was made August 9, 1913, the day after this suit
was instituted.

The sale was consummated and under the terms of the contract defendant became bound to pay Meyers a commission of $687.50 as the agent "through whose services this sale and contract has been made." The evidence of plaintiffs strongly supports their claim that they were the agents whose services, rendered while their authority from defendant to sell the land stood unrevoked, were the procuring cause of the sale. Keifer, with money to invest for his sons, interviewed a real estate agent in Osceola (F. M. Burch) and informed him of his purpose to buy farm lands. Burch had no such lands on his lists that were satisfactory to Keifer and learning that plaintiffs had for sale a farm in Cass county which might suit him, proposed that they go to Garden City and see that farm. The proposal was accepted and the two went to Garden City on July 13, 1913, at the expense of Burch, and called upon plaintiff who took them to the farm they wished to see. This farm did not suit Keifer and at the suggestion and invitation of plaintiffs who informed Keifer that they had defendant's farm for sale, they stopped there on their return and Keifer made an inspection of the farm and house and was introduced by plaintiffs to defendant who was at work in a field. Defendant admits he had not met Keifer before and that he knew Keifer came to the farm with a view to buying it, but lays stress upon his assertion that he had no conversation with him at the time about the sale of the farm. In a side conversation with McCulloh (one of the plaintiffs) he was informed (so he states) that he (McCulloh) had priced the farm to Keifer at $90 per acre and at that time he offered no objection to such price. Two or three days later he went to the office of plaintiffs and demanded to know of McCulloh his reason for asking $90 per acre, whereupon McCulloh told him, so he states, that in case of a sale they not only would have to give part of their commission to the

Osceola agent but also would have to give Keifer a commission of two and one-half per cent.

"I says," defendant testified, "you don't mean to say that he was going to take two and one-half per cent out of his sons, do you?" "Why, yes," he says, "that is what he told me." I says, "Well, if he did tell you that, he is too darn crooked for me to deal with. I don't care about the deal going through at all if he is that kind of a man."

Defendant states that afterward he met plaintiff Burdett and told him "I didn't want him ever to price that place again above $80. . . . You drove that man away and I lost a sale by your pricing that place so high. Well, he says, can't Meyers sell it to him? I says, I don't know whether he can or not. I says he is going to try to. I don't know whether he can make it or not." On cross-examination defendant testified that his scruples about selling to Keifer subsequently were dispelled on the latter's assurance that he had no thought of securing a secret commission to himself. Keifer, introduced as a witness by defendant, testified that in February, 1913, he visited Garden City at the suggestion of Meyers, with whom he had become acquainted at Sedalia, and was shown some farms in the vicinity and was told of defendant's farm being for sale, but admits that he did not visit the farm or meet defendant until on his trip to Garden City with Burch. After his return to Osceola from that trip he corresponded with Meyers and then made a second trip to Garden City where he met Meyers who priced defendant's farm to him at $77.50 per acre, but at last reduced the price to $75. This was satisfactory to Keifer who bought an adjoining farm and then returned home. Several days later he came back with his lawyer and entered into the contract with defendant we have described. He denied on cross-examination that he had any secret understanding with defendant and Meyers

185MoApp39

about a division of the commission the contract provided Meyers should receive. He expressed animosity towards plaintiffs which he states was engendered by their misrepresentation of the distance of the first farm they visited from a railroad, and says that because of that misrepresentation of which he first became aware on his trip to that farm, he would not have bought defendant's farm from plaintiffs at any price. He admits having had numerous dealings with real estate agents and that he knew, as a rule, that their advertised descriptions of lands they have for sale is extremely flattering, but he could not overlook a misstatement about the distance of a farm from the railroad and would not deal with an agent guilty of a fault so serious.

Plaintiff McCulloh testified that when Keifer and Burch called at his office they told him they had come to look at the McCulloh farm which was owned by witness's father. On the trip out to that place Keifer told witness that he understood from the advertised description that it was only four miles from the railroad. Witness replied that it was seven and Keifer remarked that he thought that was too far to suit him. They went on to the farm, Keifer examined it and concluded that he did not wish to buy it. On their return witness told him about defendant's farm which he said could be bought at $90 per acre. Keifer signified an interest in the place and they drove there. The farm was thoroughly examined by Keifer who was introduced to defendant by witness as a prospective buyer. While there witness took defendant aside and asked "what is your low dollar on the farm?" Defendant replied "I will take $75 net to me. You boys get your commission above that." Witness said "All right, then, we have priced it at $90 and we can take off easier than we can put on," and added that Mr. Burch had "brought Keifer up here from Osceola . . and we are going to split the commission with him."

Before Keifer and Burch returned to Osceola witness told the latter to price the land to Keifer at $80 per acre, to accept an offer of $77.50 per acre and "if he (Keifer) makes a step at $75 you wire me, don't wait to write a letter and I will get in an automobile and go out and see Mr. Parish and see if he won't pay two and a half per cent out of $75. I don't want to spoil a deal in any way, shape or form."

Burch, who it should be understood, was not employed as the agent of Keifer, corroborates the testimony of McColloh and continuing the history of the transaction, testified that on the return with Keifer to Osceola he told Keifer that the farm could be bought at $80 per acre and sometime after their return, reduced the price to $77.50 per acre.

It will not be necessary to go further into the details of the evidence. There is ample evidence to sustain the contention of plaintiffs that they and their associate Burch initiated the negotiations which, without break or cessation, culminated in the sale of defendant's farm at $75 per acre, and further we find from the testimony of the witnesses for plaintiffs and from the statements and admissions in the testimony of defendant and Keifer substantial support for the inference that the injection of Meyers into the transaction by defendant and Keifer was not due to the different reasons assigned by them, nor prompted by a proper motive, but was done in bad faith to enable Keifer to gain a secret reward to himself at the expense of his own children. Defendant's attempt to lay upon plaintiffs the charge of being in such unholy conspiracy with Keifer and his outburst of righteous indignation smack evily of dissimulation and suggest as apropos the maxim "*honi soit qui mal y pense.*" His explanation of the fact that he did deal with Keifer is most tame and unsatisfactory and Keifer's reason for the clandestine manouvering to escape plaintiffs and Burch and to put Meyers in their rightful place is just as un-

satisfactory. We are not holding that the evidence indisputably establishes such bad faith but that its existence is an inference that fairly may be drawn therefrom.

In support of the position that plaintiffs, on their own showing, are not entitled to recover, counsel for defendant invoke the rule that "where an agent takes land to sell for a net price to his principal, he cannot recover any commission unless he sells for more than the net price." [Citing Blackwell v. Adams, 28 Mo. App. 1. c. 63, 64; Crowley v. Summerville, 70 Mo. App. 1. c. 380; LaForce v. University, 106 Mo. App. 517; Hughes v. Dodd, 164 Mo. App. 454; Cies v. Gale, 168 Mo. App. 282; Young v. Stecher, 168 S. W. (Mo.) 611.]

In instances where the employment of the agent is not on terms which make his right to receive a commission depend upon his producing. a sale at a fixed net sum to the principal, the rule in this State is that where the principal makes a sale to a buyer found and introduced by the agent, he cannot escape liability for a commission on the ground that he sold at a less price than that at which he listed the property with the agent. [Hovey v. Aaron, 133 Mo. App. 1. c. 582; Lipscomb v. Mastin, 142 Mo. App. 228; Perry v. Edelen, 164 S. W. 645 (Mo. App.); Hamilton v. Hathaway, 152 Mo. App. 483; Wetzell v. Wagoner, 41 Mo. App. 509; Duncan v. Turner, 171 Mo. App. 670; Glade v. Mining Co., 129 Mo. App. 443.]

As was said in Hovey v. Aaron, supra, if defendant while plaintiffs' authority stood unrevoked, chose to sell the property, either in person or through another agent, to a customer procured by the efforts of plaintiffs for a less price than that which plaintiffs were authorized to offer, that was his privilege, but he will not be permitted to reap the fruits of plaintiff's labor, and then deny them their just reward.

But the distinction between such cases and cases where the contract for the agent's commission provides that the commission shall consist of the sum at which the agent may sell the property in excess of a net price to the principal is properly drawn in the case of Hughes v. Dodd, supra, where it is said: "Courts cannot make contracts for individuals. When a broker for an agreed commission is employed to sell certain real estate at a fixed price but does not. procure a purchaser at that price and the owner sells it at a less price, the broker is not entitled to recover a commission even though it appear that the purchaser to whom the sale was made was procured by him. The commission is not earned until the broker sells to a purchaser at the fixed price. [Parker v. National Mut. B. & L. A. (W. Va.), 46 S. E. 811; Noyes v. Caperton (W. Va.), 69 S. E. 364; Blackwell v. Adams, 28 Mo. App. 61.]" In such contracts the broker agrees, in substance, that in consideration of the opportunity of employing his talents to procure for himself a larger commission than he would be entitled to receive under ordinary employment, he will run the risk of procuring a buyer who will pay no more than the fixed price and thus deprive himself of any reward. [LaForce v. University, supra.]

But in none of the reported cases is the right of the principal to sell at the fixed price to a buyer introduced by the agent recognized as unqualified. The principal must act in good faith toward his agent and is not allowed, while the agent's authority stands unrevoked, and he is laboring in good faith to make a sale at a price that will give him a commission, to fraudulently or improperly interfere with the agent by selling to the buyer produced by the agent, at the fixed net price. In Hughes v. Dodd, supra, it is expressly noted that "this case presents no evidence that defendant improperly interfered with the making of a

sale by plaintiffs at the price stipulated, nor that he prevented the strict performance of the contract."

In Cies v. Gale, supra, we found that the sale "was made in good faith and not for the purpose of defeating a commission." Such employment necessarily implies that the principal will give the agent a fair chance to earn a commission and will not interfere until he has had a reasonable opportunity to sell at a profit to himself and has failed. Where the principal ignores such right of the agent, and, rushing in, sells to a buyer produced by the agent at the fixed net price, or for less, he is in no position to urge that the agent failed to produce a customer ready, able and willing to buy at a greater price and, therefore, is not entitled to a commission, since that would allow him to take advantage of his own wrongful invasion of the agent's contractual rights. In such a case the principal would be liable to the agent on the theory that his own unwarranted interference prevented the agent from earning a reasonable commission. These considerations lead to the conclusion that the court did not err in sending the case to the jury as one involving issues of fact for them to determine.

There being abundant room in the evidence for the conclusion that defendant, immediately after being introduced to Keifer by plaintiffs, brushed them aside without giving them a reasonable opportunity to effect a sale and, keeping them in the dark, carried on negotiations with Keifer which ended in a sale at the fixed price, the jury were entitled to find that plaintiffs had performed their part of the contract and that defendant's interference alone was the cause of their failure to make a sale at a price remunerative to them. Of course if such interference was induced by a fraudulent scheme between defendant, Keifer and Meyers to injure plaintiffs, or to secure a secret commission to Keifer, it was the more culpable, but plaintiffs' right to recover may rest entirely upon the hypothesis of

an untimely and improper interference as distinguished from one induced by fraud.

Point is made by defendant that since this suit was brought before the contract of sale was approved by the county court in Oklahoma, plaintiffs, whose cause must be regarded as it stood at the time the suit was brought cannot recover, because the contract of sale at that time was conditional and depended upon the approval of that court. In view of the conceded fact that the sale was approved and consummated the point is extremely technical and, we think, cannot be allowed. The rule is well settled that where the agent employed to produce a customer who is ready, willing and able to buy on the terms proposed by the principal, produces a customer whom the principal accepts and with whom he enters into a contract, the agent has earned his commission. [Lombard v. Sills, 170 Mo. App. 555; Glade v. Mining Co., supra.] As we understand the contract the deposit of three thousand dollars Keifer was required to make with defendant, at the signing of the contract, was to be forfeited to defendant if Keifer failed to complete the purchase of the land, and so far as that deposit was concerned, the contract was not conditional. In no sense may it be treated as a mere option agreement and cases dealing with agreements of that nature was not in point. Defendant incurred no risk of the rejection of the contract by the county court but took mortgages in the form of a sufficient deposit to protect him and his agents. Under such circumstances he will not be heard to claim that he should be allowed to defeat the collection of a commission on the ground under consideration.

We have sufficiently answered the points made by defendant and, finding no error in the record, the judgment is affirmed.

All concur.