## HAZEL CLOSE, Appellant, *v.* R. REDELIUS, Respondent.

No. 3587

March 6, 1950.                                        215 P.2d 659.

*Bert M. Goldwater* and *David Goldwater,* Reno, for Appellant.

*Kendrick Johnson,* Reno, for Respondent.

## OPINION

By the Court, Horsey, C. J.:

The appeal in the instant case is from the judgment rendered and entered on the 16th day of May, 1949, in

department No. 1 of the Second judicial district court of the State of Nevada, in and for the county of Washoe, by the Honorable William McKnight, district judge, and from the district court's order denying defendant's motion for a new trial.

In connection with our study of the record in the instant case, we have carefully read and considered, among other things, the opinion and decision of the court below, and have been much impressed by the statement of facts, comments and conclusions included therein, and can do no better than quote in detail therefrom, as follows:

"Opinion and Decision

"Plaintiff brought an action to recover the sum of $1,200.00, alleged to be due for his services as a licensed real estate agent in procuring a purchaser for property of defendant, known as the Paradise Beauty Salon, in Reno, Nevada. From a judgment against defendant as prayed, defendant has moved for a new trial, has filed objections to the findings of fact and conclusions of law submitted by plaintiff, and has proposed other findings of fact and conclusions of law.

"The different phases of the matter have been argued so seriously by defendant's counsel that a complete statement of the facts is deemed necessary.

"On June 24, 1947, defendant orally listed the Paradise Beauty Shop, in Reno, Nevada, with the plaintiff, a licensed real estate broker, through plaintiff's agent, Sally Clark, also a licensed real estate broker, exclusively, without limit as to time, for sale, to net defendant $20,-000.00. Defendant stated to Sally Clark; 'Sally, I have spent $11,000.00 remodeling this place and putting in new equipment, and I have to have for my share, $20,-000.00,' whereupon Sally Clark replied: 'Well, all right, Hazel, of course, we have to add our fee to that, which is ten percent on all business deals, and ten percent of $20,000.00 is $2,000.00 making it $22,000.00.' Terms were not discussed, other than defendant first stated that she would like cash, and 'I might come down a little

on that price, but I have to get awful close to $20,000.00.' In response to the question, 'What is the lowest amount down,' propounded to defendant by Sally Clark, defendant replied: 'The least I will take down will be $5,000.00, I will take a piece of income property or a house because I could rent it, Sally.' Defendant then stated that she was paying $250.00 on a note for $5,000.00, and that the purchaser would have to make those payments. An inventory of the place was then made by defendant and Sally Clark, so that plaintiff would have a record. (Plaintiff's Exhibit D.) Thereupon the property was listed in plaintiff's record book, as an exclusive listing, for sale for $22,000.00.

"Plaintiff thereafter advertised the property for sale in the Reno papers for a period of about six weeks. Mrs. Carma D. Wygant, of Winnemucca, Nevada, read the advertisement, and, after first telephoning for information regarding the beauty shop and being informed by Sally Clark that the information could not be given on the telephone because 'it was an exclusive,' called at plaintiff's office on August 13, 1947. Mrs. Wygant was then shown the property by Sally Clark, and was quoted the price of $22,000.00. Mrs. Wygant wanted to pay less, offering to pay $20,000.00, and they compromised on a price of $21,200.00, whereupon Mrs. Wygant issued a check for $200.00, payable to plaintiff, subject to her husband's approval of the property.

"On August 17, 1947, Mrs. Wygant and her husband called at plaintiff's office, and were shown the property by Sally Clark, after which Mr. Wygant gave Sally Clark a check, payable to plaintiff, for the sum of $4,800.00, and he and his wife signed a paper agreeing to purchase the property for $21,200.00, and in which they agreed to pay defendant the sum of $20,000.00, payable as follows: the sum of $5,000.00 in cash, they to assume and pay the $5,000.00 obligation against the property, and to pay the sum of $10,000.00 at the rate of $150.00, or more, a month, with interest at the rate of 6 per cent per annum. (Plaintiff's Exhibit A.)

"This offer could not be shown to defendant immediately, because she was then very ill in the hospital and could not see anyone. However, a few days after the offer, Sally Clark left the agreement with defendant's sister to show to defendant.

"Mr. and Mrs. Wygant directed the bank to stop payment on the check for $4,800.00, until they 'got the inventory on it,' whereupon the bank attached a paper to the check reading: 'Payment Refused until deal goes through.'

"On August 29, 1947, plaintiff telephoned to Mrs. Wygant, at Winnemucca, Nevada, about stopping payment on the check for $4,800.00, and Mrs. Wygant stated: 'Because Mrs. Hazel Close had not signed her acceptance of $21,200.00, the offer, she had been advised to stop the transaction, and regardless of that, * * * you continue on that, we want the place; * * * to keep in contact with Mrs. Close and see if they could not get it.'

"Defendant returned to her home from the hospital about August 31, 1947. A few days thereafter the signed agreement was shown to defendant at her home by Sally Clark, who then said to defendant: 'Hazel, you no doubt, have seen the agreement,' whereupon defendant replied: 'Yes, I have seen it. I have not made up my mind yet about it.' Sally Clark then said: 'Of course, you have read the agreement,' and defendant said: 'Yes.' Defendant said she would think it over and let Sally Clark know. Sally Clark then said: 'We have to do something about this, one way or the other and we have waited quite a while for your answer and these people are anxious for your answer.'

"The plaintiff then called upon defendant at her home, and had a conversation with her with reference to the matter, and defendant said: 'Yes, I am well informed. I have been informed by my sister.' Defendant said she was not sure; 'that things had changed since I have been in the hospital and my sister advises me against it, and I would prefer you people try to sell the Marinello Beauty School.'

"Plaintiff never told Mrs. Wygant that the deal was off, but she and her husband 'just figured we could not get it; * * * that plaintiff 'could not produce it for us.'

"On 'Sunday, the day of the Water Follies,' (which in fact was September 7, 1947) Mr. and Mrs. Wygant came to Reno from Winnemucca, 'to see the Water Follies.' As they were then 'very anxious to buy this place for $21,000.00,' they called upon defendant at her home. They wanted to meet Mrs. Close 'and talk about the Paradise Salon.' They then told the defendant that 'if she ever wanted to sell, to let us know.' The defendant 'said the beauty salon was not for sale at present and she would let us know if the doctor said she would not be able to handle it.' They did not discuss the terms of the sale with defendant, but defendant 'mentioned, if she decided to sell, could we get cash for that, and we told her we could. We have property here and we could have borrowed the balance. * * * We just figured it was $21,200.00 we would have to give.' Mr. and Mrs. Wygant did not have $21,200.00 ready at any time in cash, but they could always have gotten it; they could have borrowed it from the bank.'

"On September 8, 1947, Attorney George Lohse, representing Mr. and Mrs. Wygant phoned to plaintiff and wanted to know why the deal had not been closed, and, finally, he suggested that plaintiff had better send the $200.00 back to Mrs. Wygant. Plaintiff thereupon drew his check for $200.00, and handed it to Attorney Lohse's Secretary. (Plaintiff's Exhibit B.)

"About October 1, 1947, defendant and Herbert P. Graffam, a real estate salesman employed by plaintiff, discussed the fact that the Wygants were still very much interested in the purchase of the Paradise Beauty Salon, and defendant at that time told said salesman that if the deal was consummated that she would put it through plaintiff's office.

"Defendant did not, however, thereafter even attempt to put the deal through plaintiff's office. Instead, defendant's sister telephoned to the Wygants, in Winnemucca,

on or about October 2, 1947, and told them that defendant 'wanted to sell the place.' On the following Sunday, about October 5, 1947, Mr. and Mrs. Wygant came to Reno, and called upon defendant at her home to see about the purchase. They did not make an offer to defendant. Defendant 'said what she wanted, she wanted $20,000.00.' Defendant also said, 'I would have to have $8,000.00 immediately and $1,000.00 in sixty days, and I would have to have $250.00 per month thereafter.'

"On October 10, 1947, an agreement was drawn by attorney J. T. Rutherford at the request of defendant, covering the sale of said property from defendant to Mr. and Mrs. Wygant, for the sum of $20,000.00, payable $8,000.00 down, $1,000.00 within sixty days and $11,000.00 in monthly installments of $250.00 a month, or more, with interest at the rate of six per cent per annum on the monthly balance remaining unpaid, said monthly installments of $250.00 to include both principal and interest, and which agreement also provided that:

" 'It is further agreed by and between the Seller and the Buyers that the said Buyers will pay any and all commissions of real estate agents or others, which may be now due or which may hereafter become due incidental or relative to the consummation of the sale and/or purchase of said Paradise Beauty Salon.' (Defendant's Exhibit 1).

"Defendant submitted this agreement to Mrs. Wygant, who handed it to Attorney W. M. Kearney for examination. After more discussion between defendant and the Wygants, Attorney Kearney drew an agreement, which provided that the Wygants purchase the Paradise Beauty Shop from the defendant for the sum of $20,000.00, payable as follows: the sum of $8,000.00 in cash, the sum of $1,000.00 in sixty days, Arlington and Urban lots of the agreed value of $7,500.00, and the balance of $3,500.00 at the rate of $250.00 per month. Nothing about any real estate commission was mentioned in this agreement.

"Prior to the closing of this deal, plaintiff learned that defendant was dealing direct with the Wygants for the

sale of the Paradise Beauty Salon. He thereupon asked defendant to come to his office, and upon learning the terms of the contemplated sale, advised defendant not to make it, and informed her that if she went ahead with the deal that she would have to pay his office the commission of $1,200.00. The defendant then attempted to have the purchasers pay the commission, but they absolutely refused to do so. She then attempted to have them pay one-half of the commission, but they likewise refused. Defendant then closed the deal, knowing that plaintiff would insist upon the payment of $1,200.00, and knowing that the purchasers would pay no part of it; and she stated to Mr. Kearney, the attorney for the purchasers, that 'she would take care of the real estate fee if it ever came up;' and she admitted to others her obligation to pay to plaintiff the commission of $1,200.00.

"The above facts are, in my opinion, clearly established by the evidence, although they are, in some respects, contrary to the testimony of defendant and her witnesses. Where in conflict with the above facts, the testimony of defendant and her witnesses cannot be, and is not, accepted as true.

"Counsel for defendant have filed a brief, in which they state:

" '* * * the plaintiff promised and agreed to accept as payment for his services any sum over and above $20,-000.00 cash for the sale of the Paradise Beauty Salon. It was understood and agreed by plaintiff and defendant that $20,000.00 cash was to be paid net to the defendant and defendant agreed that plaintiff might retain any sums over and above that amount. The contract was a special contract with a condition that defendant should receive $20,000.00 net cash and there were no promises on the part of defendant to pay a commission nor was there any general brokerage listing of the premises.'

"It is true that defendant listed the property with plaintiff for sale, to net defendant $20,000.00, but it is not true that this sum was to be paid in cash. At the time of said listing, defendant stated: 'The least I will

take down will be $5,000.00, I will take a piece of income property or a house because I could rent it, Sally.' Defendant also then stated that she was paying $250.00 a month on a note for $5,000.00, and that the purchaser would have to make those payments. Nothing was said regarding the terms of payment for the remaining $10,-000.00.

"If the offer made by the Wygants, through plaintiff, to which defendant made no objection, but simply stated, in effect, that she did not then desire to sell, did not comply literally with the price and terms stated by defendant, it certainly was in substantial compliance therewith.

"Where a purchaser is produced by the broker in substantial compliance with the terms of the agreement, and the owner makes no objection to the terms of the offer of purchase or the details of performance, but simply declares that he does not now desire to and will not sell his land, he is estopped, after suit is brought upon the agreement, to shift his position and defend upon objections to details that the broker might have supplied or corrected if they had been mentioned by the owner when the offer of purchase was made. Braniff v. Baier, 101 Kan. 117, 165 P. 816, L.R.A. 1917E, 1036, 1939; 12 C.J.S., Brokers, § 95, page 224, note 49; see, also: Moss v. Warns, 245 Wis. 587, 15 N.W. 2d 786, 787 [156 A.L.R. 598]; Sherwood v. Rosenstein, 179 Minn. 42, 228 N.W. 339.

"But, if it can be assumed that the plaintiff cannot recover until he shows that he found a buyer who was ready, willing and able to purchase the property for a sum in cash, sufficient in amount to net the defendant $20,000.00 and enable plaintiff to receive as his compensation all in excess of that sum, then it is clearly established by the testimony of Mrs. Wygant that plaintiff is entitled to judgment in the sum of $1,200.00.

"Mrs. Wygant testified, in effect, that she and her husband did not have the sum of $21,200.00 in cash at any time, but that they could always have borrowed it from the bank; that they informed defendant, in response to

her inquiry, that they could pay cash for the property; and they 'just figured it was $21,200.00 we would have to give.'

" 'The purchaser must be able to buy; and the word "able" means financially able. This does not mean, however that such purchaser must have all the money in his immediate possession or to his credit at a bank, but only that he must be able to command the necessary funds to close the deal within the time required.' Laack v. Dimmick, 95 Cal.App. 456, 273 P. 50, 55; Hersh v. Garau, 218 Cal. 460, 23 P.2d 1022, 1025; Philbrick v. Chase, 95 N.H. 82, 58 A.2d 317, 3 A. L. R. 2d 526, 530; C. O. Frick Co. v. Baetzel, 71 Ohio App. 301, 47 N.E. 2d 1019, 1021. See, also: Hays v. Goodman-Leonard Realty Co., 146 Miss. 766, 111 So. 869, 870; McCabe v. Jones, 141 Wis. 540, 124 N.W. [486] 487.

"In support of his contention that the evidence does not warrant a judgment in favor of plaintiff, counsel for defendant insists, in effect, that where a broker's contract of employment provides for a net price to the owner, the broker to receive as his compensation the sum in excess of such net price which is paid, an actual sale for an amount exceeding the net price must be made before the broker is entitled to any compensation.

"It is wholly unnecessary to now review the cases cited by defendant's counsel, because not a single one of them holds that the broker is not entitled to compensation when, as in this case, the sale for an amount in excess of the agreed net prices was prevented by the fault of the owner. If, in fact, such a sale was so prevented, the broker is clearly entitled to compensation. Ramezzano v. Avansino, 44 Nev. 72, 81, 189 P. 681; Murphy v. W. & W. Live Stock Co., 26 Wyo. 455, 187 P. 187, 189 P. 857, 860; Burdett v. Parish, 185 Mo.App. 605, 172 S.W. 620, 623; Weiss v. Northern Dredge & Dock Co., 155 Md. 351, 142 A. 253, 257; 9 C.J., Brokers, pages 587–589, sec. 85, note 10; 12 C.J.S., Brokers, pages 180–182, § 83, note 2; Note 43 A.L.R. 1111; 128 A.L.R. 432; 8 Am.Jur., Brokers, sec. 141.

"In Burdett v. Parish, supra, the court in speaking of contracts which provided that the agent's compensation shall consist of the sum at which the agent may sell the property in excess of a net price to the principal, said [185 Mo.App. 605, 172 S.W. 623]:

" 'But in none of the reported cases is the right of the principal to sell at the fixed price to a buyer introduced by the agent recognized as unqualified. The principal must act in good faith toward his agent, and is not allowed, while the agent's authority stands unrevoked, and he is laboring in good faith to make a sale at a price that will give him a commission, to fraudulently or improperly interfere with the agent by selling to the buyer produced by the agent at the fixed net price. * * * Such employment necessarily implies that the principal will give the agent a fair chance to earn a commission, and will not interfere until he has had a reasonable opportunity to sell at a profit to himself and has failed. Where the principal ignores such right of the agent and, rushing in, sells to a buyer produced by the agent at the fixed net price, or for less, he is in no position to urge that the agent failed to produce a customer ready, able, and willing to buy at a greater price, and therefore is not entitled to a commission, since that would allow him to take advantage of his own wrongful invasion of the agent's contractual rights. In such a case the principal would be liable to the agent on the theory that his own unwarranted interference prevented the agent from earning a reasonable commission.'

"This case is removed from the general rule invoked by counsel for defendant, by the acts of the defendant in preventing plaintiff from selling the property to the purchasers for the sum of $21,200.00, and in selling the property to the persons procured by plaintiff for the sum of $20,000.00 when those persons were ready, able and willing to pay the sum of $21,200.00.

"The sum of $1,200.00 being slightly more than one-half of the charge usually made by a broker for selling business property from which the owner receives the

sum of $20,000.00, is certainly a reasonable sum to be paid plaintiff for the services rendered by him, said services being reasonably worth that sum.

"Counsel has cited some cases from other jurisdictions in support of his contention that 'Where a contract is expressed and special, there can be no quantum meruit recovery.' It is not necessary to discuss those authorities, because they are opposed to the 'contrary and more equitable rule' which prevails in Nevada. Burgess v. Helm, 24 Nev. 242, 249, 51 P. 1025; Oliver v. Little, 31 Nev. 476, 479, 103 P. 240; Warren v. Glasgow & Western Exploration Co., 40 Nev. 103, 108, 160 P. 793, 794; Maitia v. Allied Land & Live Stock Co., 49 Nev. 451, 465, 248 P. 893, 897; Paterson v. Condos, 55 Nev. 134, 142, 28 P.2d 499, 500; Berrum v. Georgetta, 60 Nev. 1, 5, 93 P.2d 525, 526, 98 P.2d 479.

"Therefore, defendant's motion for a new trial should be, and the same hereby is, denied.

"Defendant's objection to the Cost Bill is sustained as to the amount of Sheriff's fee for serving summons in Humboldt County, upon the ground that it is not a proper charge. Her objection to the item of $12.00, paid to the secretary of the attorney for defendant for copy of deposition of plaintiff taken by defendant, is not sustained, because that is clearly a proper charge.

"Defendant's objections to the findings of fact and conclusions of law submitted by plaintiff are overruled, and defendant's proposed findings of fact and conclusions of law are denied and refused.

"Dated May 16, 1949.

"Wm. McKnight
"District Judge."

■■ Referring to the evidence, it is not our province in the appellate court to weigh the evidence, but on the contrary, to determine whether or not in the instant case, in which there is conflict, there is substantial evidence to establish the essential facts. This we have done in the instant case, and have found from the evidence

that same is clearly sufficient to justify the findings and conclusions of the court below.

Counsel for the appellant (defendant) has stressed the difference between an ordinary brokerage listing agreement and a special agreement in the nature of a unilateral contract, whereby, as to the latter, the defendant promised and agreed to deliver certain property, the beauty parlor known as "Paradise," 225 West 1st Street, Reno, Nevada, to a purchaser, providing she received $20,000 cash net to herself. In connection therewith, in the "Opening Brief of Defendant and Appellant," it is asserted, on page 11, as follows: "It would be well to determine the nature of the agreement between the plaintiff and the defendant before proceeding further. This is not a case of a general brokerage listing contract whereby there is a promise on the part of an owner to pay a commission to a broker for obtaining a purchaser who is ready, willing and able to purchase the owner's property. This is a special agreement between plaintiff and defendant in the nature of a unilateral contract whereby defendant promised and agreed to deliver her property to a purchaser providing she received $20,000.00 cash net to herself. Her only promise and agreement was that the plaintiff might retain any excess over her net price as his own. It was, therefore, a special agreement entirely dependent upon plaintiff's performance to furnish a customer so that defendant could net $20,-000.00 in cash. The compensation of plaintiff in this case was clearly fixed by the contract between the parties. Such contracts whereby the broker receives the excess over the price named are common * * *."

The language employed above would operate to disregard entirely any right or obligation on the part of the broker resulting from his having been the procuring cause of a sale as between the owner and the purchaser, even though the owner and the purchaser proceeded to carry out such transaction without affording the broker any fair opportunity to earn his commission. This is

not the law, at least it is not in accordance with such cases as Burdett v. Parish, supra, and which has been quoted from at length by Judge McKnight, nor is it the law as found by our own Nevada cases, particularly Ramezzano v. Avansino, supra.

In connection therewith, respondent's attorney, Kendrick Johnson, Esq., in the "Answering Brief of Plaintiff and Respondent," has stated:

"The Nevada case of Ramezzano v. Avansino, 44 Nev. 72, is not in point for the appellant, for the court states on page 84, paragraphs 7 and 8 [189 P. 681]:

" 'It is well settled that if property is placed in the hands of a broker for sale at a certain price and a sale is brought about through the broker as a procuring cause, he is entitled to his commission on the sale, even though the negotiations are conducted through the owner, who, in order to make a sale accepts a price less than that stipulated to the broker.' "

In the present opinion, it is our view, in comparing the attitude of the respective parties, that, from a *moral* standpoint alone, Mrs. Wygant was seriously in fault. It is true that she had demanded that the $200 deposit theretofore delivered by her to Mr. Redelius be returned, and, technically, at least, and perhaps legally, she was free to disregard completely the transaction she and her husband had entered into with Mr. Redelius. But morally, even equitably, Mr. Redelius had served as a broker in bringing the parties together, and had treated her with proper and due courtesy and consideration, and her acts and conduct in relation to the transaction in question, together with that of Mrs. Close, as owner, had the effect of preventing Mr. Redelius from being accorded any reasonable opportunity to earn his commission. Indeed, Mrs. Wygant's persistent action in repeatedly refusing to pay the commission, or even one half thereof, necessarily caused Mrs. Close to be compelled either to refuse to make the deal, or to pay the commission, or in the alternative to leave the matter in default, insofar as the right of Mr. Redelius was concerned.

In the circumstances, while we have indicated that Mrs. Wygant's action was not commendable, being highly unethical and unfair, it was Mrs. Close who, in a legal sense, owed the duty properly to compensate Mr. Redelius for his services as a broker, by paying him his commission, provided Mrs. Wygant refused to pay same, and Mrs. Close, nevertheless, carried through the transaction. Mr. Redelius, by virtue of the listing agreement, was entitled to a commission, which was only six percent, instead of the usual ten percent, and the relationship between Mrs. Close and Mr. Redelius not having been terminated. Mrs. Close could not legally, or equitably, rid herself of such obligation, and her only proper course would have been to state, unequivocally, to Mrs. Wygant that she, Mrs. Wygant, must either agree to pay the commission, or at least to pay one half thereof in accordance with Mrs. Close's offer to her, or else that she, Mrs. Close, would decline to enter into the contract. This she failed to do.

Mrs. Wygant testified that, in connection with closing the transaction, Mrs. Close stated to Mr. Kearney, the attorney for the purchasers, that "she would take care of the real estate fee if it ever came up."

Mrs. Close, in her testimony on cross-examination, stated, in answer to a question propounded by Mr. Johnson, plaintiff's attorney:

"Q. (Mr. Johnson) You did affirmatively state that you would pay it? A. No, I did not say I *would* pay it. I said, with my bad luck I would *probably have to pay it.*" (Italics mine.)

In view of the fact that Mrs. Close was willing to pay one half of the commission, at one point in the negotiations, and at another time, just when the deal was being closed, in Mr. Kearney's office, stated she "would probably have to pay it," it appears that what she said was at least tantamount to stating that she realized her obligation to pay the commission, but that she had not affirmatively so stated.

The attorneys for the appellant have contended that

"where a contract is expressed and special, there can be no quantum meruit recovery," and cited authorities from other jurisdictions in support of that contention. And Judge McKnight, in his able opinion, on page 12, hereinbefore quoted, has stated: "It is not necessary to discuss those authorities, because they are opposed to the 'contrary and more equitable rule' which prevails in Nevada," and, in that connection, has enumerated and cited the six Nevada cases hereinbefore set forth, on page 12 of his said opinion, and it is unnecessary to repeat them.

We feel that these authorities, heretofore decided by this court and listed in Judge McKnight's opinion, above quoted, have represented, from time to time, the views of a considerable number of the justices of this court, and that they constitute ample authority to justify respondent's recovery upon quantum meruit.

This court is of the opinion that the lower court's findings, conclusions and judgment in the matter of costs are correct and without error.

It is, therefore, hereby ordered that the final judgment rendered, entered and filed in the lower court May 16, 1949, and that court's order denying defendant's motion for a new trial, be, and the same hereby are affirmed.

BADT, J., and EATHER, J., concur.