879 P.2d 69 (1994)
110 Nev. 984
FLAMINGO REALTY, INC., a Nevada Corporation; and Terry Fields, Individually and in Her Capacity as an Agent of Flamingo Realty, Inc., Appellants,
v.
MIDWEST DEVELOPMENT, INC., a Nevada Corporation; Torosan, Inc., a Nevada Corporation; Pius Reiger; and Leroy Hilt, Respondents.
No. 23544.
Supreme Court of Nevada.
August 10, 1994.
*70 K. Michael Leavitt, Jason G. Langess and David Rivers, Las Vegas, for appellants.
Cherry, Bailus & Kelesis, Las Vegas, for respondents Midwest, Reiger and Hilt.
Edward R.J. Kane, Las Vegas, for respondent Torosan.

OPINION
STEFFEN, Judge:

THE FACTS
Respondent Midwest Development, Inc. ("Midwest") owned a 45-acre parcel of real property situated in Las Vegas. Respondents Pius Reiger and Leroy Hilt were the principal shareholders of Midwest. In May of 1990, Midwest decided to sell the parcel for a net price of $5,250,000.00. Appellant Terry Fields[1] approached Midwest in early September of 1990 and offered to provide a "ready, willing, and able" purchaser of the subject property. Thereafter, Midwest executed in favor of Fields a nonexclusive listing agreement that recited a "list price" of $5,750,000.00 and a realtor's commission of 8.75%. The list price, less the commission, would have netted approximately $5,250,000.00 to Midwest.
Fields immediately delivered to Midwest a purchase offer of $5,750,000.00 from Bodysonic, a Nevada corporation whose primary shareholder and officer was a Japanese businessman by the name of Kyota Yamada. However, Bodysonic's purchase offer was contingent upon the "approval of a joint venture/partnership agreement by and between the buyer and seller." After intensive negotiations, the parties were unable to reach an agreement regarding the joint venture and Yamada returned to Japan without closing the sale. The listing agreement, which was executed on September 7, 1990, terminated by its own terms on September 20, 1990.
In late 1990, Bodysonic submitted a second purchase offer in the amount of $5,325,000.00. Fields had continuously worked with Yamada in preparing the offer and finding an unrelated joint venturer to aid in developing the property. Bodysonic's offer contained a provision stating that Midwest would be responsible for paying Fields' commission. Midwest delivered a counteroffer to Bodysonic specifying the $5,325,000.00 as a net price[2] and omitting the paragraph relating to Fields' commission. By the parties' own admissions, the only impediment to closing the transaction was Fields' commission.
Midwest ultimately sold the property to respondent Torosan, Inc., ("Torosan") for $5,300,000.00, and Torosan immediately resold the property to Bodysonic for $5,325,000.00. When Fields learned of the latter sale, she demanded that Midwest pay her a commission. Midwest refused, prompting Fields to file a complaint against Midwest, its principals, and Torosan for fraud, fraudulent conveyance, and breach of contract. Torosan responded by filing a counterclaim against Fields for its attorney's fees and the costs of defending a "frivolous and/or meritless lawsuit."
*71 After a bench trial, the district court found that Fields had failed to prove the necessary elements of her claims, and awarded Torosan attorney's fees and costs as damages on its counterclaim. The court also found that Fields had failed to produce a "ready, willing, and able" purchaser according to the terms of the expired listing agreement. Despite the foregoing, the court did find that Fields had been the procuring cause of the ultimate sale and that she was entitled to compensation. Because there was insufficient evidence in the record to determine the amount to award Fields, the court reopened the trial for the limited purpose of determining the reasonable value of Fields' services.
Fields' expert, Ron Reiss, testified that the customary value of Fields' services was somewhere between 8 and 10 percent of a property's selling price. Reiss buttressed his testimony with significant evidence of similar listings and transactions. However, his opinion was based upon his belief that Fields had complied with the terms of a standard, percentage-based listing agreement. Respondents' expert witness, Shirley Rappaport, conceded that real estate commissions are normally determined as a percentage of the selling price. Rappaport nevertheless analyzed Fields' "experience, income, the quality and quantity of services performed, duration of the services and other factors" and concluded that Fields' compensation could be calculated by reference to an hourly wage. The district court accepted Rappaport's evidence and determined that "Fields devoted at least 40 hours per week for a period of six months for $92,304.00, and at least 20 hours per week for two months for $15,384.00, or a total of $107,688.00."

DISCUSSION
Fields raises four assignments of error on appeal: (1) the court used an inappropriate measure of damages under quantum meruit; (2) the court erred in finding insufficient evidence of fraud; (3) the court erred in awarding attorney's fees and costs to Torosan; and (4) the court erred in refusing to pass Torosan's costs through Fields and to the nonprevailing defendants Midwest, Reiger and Hilt.

1. The appropriate measure of damages under quantum meruit

A district court is given wide discretion in calculating an award of damages and an award will not be disturbed on appeal absent an abuse of discretion. Parsons Drilling, Inc. v. Polar Resources Co., 98 Nev. 374, 377, 649 P.2d 1360, 1363 (1982). In the instant case, the parties recognize that the proper measure of damages under a quantum meruit theory of recovery is the "reasonable value of [the] services." Morrow v. Barger, 103 Nev. 247, 252, 737 P.2d 1153, 1156 (1987). Unfortunately, the parties disagree on the best method of measuring the "reasonable value" of Fields' services.
In Florey v. Sinkey, 77 Nev. 275, 362 P.2d 271 (1961), the respondent was the "procuring cause" of a sale of mining property. Based upon an implied agreement that the sellers would pay the respondent "the reasonable value of his services," the trial court awarded the respondent 10% of the sale proceeds. In affirming the award, we concluded that "the sum found to be due ... as compensation for his services, under the established custom of the mining locality, became the reasonable value of such services." Id. at 279, 362 P.2d at 273. Thus, we have previously recognized the applicability of "established customs" when determining the "reasonable value" of a real estate agent's services. We are persuaded that the standard used in Florey should have been utilized in the instant case, thereby compensating Fields based upon the customary method and rate of compensation in the real estate industry. See also Needs v. Hebener, 118 Idaho 438, 797 P.2d 146, 151-52 (Idaho Ct.App. 1990) (the reasonable value of services is determined by the nature of the work and the customary rate of pay for such work in the community).
The district court abused its discretion when it expressly refused deference to the manner in which real estate agents are customarily paid.[3] Both experts testified that *72 real estate agents are not customarily paid an hourly wage. In fact, Rappaport testified as follows concerning the hourly wage schematic she presented to the court:
I was looking at something other than a commission which I have never really done before, and it's really not that normal in the real estate business, but this is the only way I could see that I could equate an income or something reasonable instead of giving a commission is basing on maybe what they had done before or what a good commercial salesperson could make or does make and equate it to hours.
To compound the error, Fields was unable to estimate the number of hours she worked on the sale and the district court simply estimated the hours Fields "could have worked," and multiplied those hours by an arbitrary hourly rate.
Having concluded that the trial court erred in fixing Fields' compensation, it becomes necessary to determine the value of Fields' services based upon the customary methods of compensating real estate professionals. The primary source for resolving this issue is the original listing agreement between Fields and Midwest. The district court found that the parties agreed to a "net listing" of $5,250,000.00. Substantial evidence of record supports the district court's finding. The original agreement is an important part of our analysis because a real estate agent who is the "procuring" or "inducing" cause of a sale, is entitled to the agreed commission, irrespective of who makes the actual sale or supplies the terms thereof. Schneider v. Biglieri, 94 Nev. 426, 427, 581 P.2d 8, 9 (1978) (citing Bartsas Realty, Inc. v. Leverton, 82 Nev. 6, 409 P.2d 627 (1966)); see also Herrman v. Blase, 77 Nev. 127, 133, 359 P.2d 745, 748 (1961) (the agreed compensation may become the amount of quantum meruit).
We also conclude from the record that the compensation agreed to by both parties was within the customary practice for establishing a reasonable commission in the real estate industry. Although both experts testified that the percentage-based commission is prevalent in the industry, Fields' own expert testified that "net listings" are common as well. Unfortunately, in fashioning a transaction through Torosan to Bodysonic without provision for a commission to Fields, Midwest foreclosed the propriety of using Midwest's net listing requirement as a fair measure of the reasonable value of Fields' services. Fields originally presented to Midwest an offer to purchase from Bodysonic for $5,750,000.00 with an agreed commission of 8.75% of the selling price. Although the parties were unable to resolve certain impediments to that sale, Bodysonic thereafter offered to purchase the property for $5,325,000.00 with the proviso that Midwest pay Fields her commission. Rather than arranging for payment of a commission to Fields, Midwest accomplished the sale to Bodysonic through Torosan for $5,300,000.00. The difference between the original proffered purchase price of $5,750,000.00 and the eventual sales price to Torosan of $5,300,000.00 is $450,000.00, or nearly 8.5% of the actual sales price. This figure is well within the usual fee of 8-10% testified to by Mr. Reiss, and is less than the 8.75% fee originally agreed to in the listing agreement between Fields and Midwest.
The district court did not unreasonably conclude that the 8.75% commission specified in the original agreement was inapplicable under a quantum meruit analysis because that agreement was never consummated. Nor was the trial judge unreasonable in concluding that a "net listing" approach would be unfair because it would have yielded a commission of "only $5,000.00" [sic] (the difference between the net listing of $5,250,000.00 and the sale to Torosan of $5,300,000.00, actually would have yielded a commission of $50,000.00). We are nevertheless persuaded that the following complex of factors predominate: (1) the district court found that Midwest, at least through knowledge imputed through its attorney, knew that Fields was continuing her efforts to effectuate a sale to Bodysonic; (2) Bodysonic's second *73 offer to purchase for $5,325,000.00 included a proviso that Midwest pay Fields' commission; (3) Midwest thereafter consummated the sale to Bodysonic through Torosan (a newly formed Nevada corporation whose stock was owned by respondent Hilt's daughter and two sons) without any provision for payment of a commission to Fields; and (4) it was not the intention of any of the parties that Fields' services were to be gratuitous. On balance, we conclude that the combination of circumstances present in this case conduce in favor of applying the customary commission in the industry, despite Midwest's firm resolve to realize a net sales price of $5,250,000.00. In other words, as the procuring cause of the sale, we are persuaded that Fields' position is endowed with a greater measure of equity and principle than that of Midwest.
Moreover, we are unable to endorse the district court's attempt to reach a reasonable award for Fields through a speculative process of determining the hours Fields "could have" expended on the sale multiplied by an arbitrary hourly charge. We are persuaded that an award of $450,000.00 to Fields is justified by the evidence of record and the principles discussed above. She was the procuring cause of a very substantial and highly profitable sale, and the victim of an attempt to utilize the benefit of her efforts without paying her a commission. It is both just and equitable that Fields receive damages within the range of the parties' original agreement and that which is customary in the industry. We therefore modify the district court's award of damages to Fields by increasing it to the sum of $450,000.00.

2. The fraud claims

Fields asks us to reweigh the evidence presented at trial and conclude that the district court erred when it found insufficient evidence to support her claims of fraud and fraudulent conveyance. The sale of the subject property from Midwest to Torosan, and from Torosan to Bodysonic is admittedly suspect and the circumstantial evidence supplies a strong basis for suspecting bad faith on the part of the respondents. However, the district court considered the voluminous evidence presented at trial and evaluated the credibility of each witness before finding against Fields on her allegations of fraud. Specifically, the district court found the defendants' "explanations which contradicted the circumstantial evidence upon which the fraud allegations were based were not rebutted in any way." We have reviewed the record and are unable to conclude that the district court's findings are clearly erroneous. Hermann Trust v. Varco-Pruden Buildings, 106 Nev. 564, 566, 796 P.2d 590, 591-92 (1990). It is a basic principle of appellate review that when substantial evidence supports the lower court's finding, as it does in this case, we will not disturb the result "despite suspicions and doubts based upon conflicting evidence." Allen v. Webb, 87 Nev. 261, 266, 485 P.2d 677, 679 (1971). The fact that we may have arrived at a different conclusion based upon our review of the cold record does not justify overruling the district court's judgment with respect to the fraud claims.

3. Attorney's fees

Torosan's counterclaim alleged that Fields' complaint was brought "without reasonable ground and/or to harass" Torosan. At the conclusion of Fields' case-in-chief, the district court simply invited Torosan to submit a summary of its fees and costs; the counterclaim was never tried. The court then awarded Torosan attorney's fees and costs under the following justification:
Torosan has counterclaimed the plaintiffs for their attorney's fees and expenses in defending this litigation. Since plaintiffs have not recovered any damages against Torosan, Torosan is entitled to an award for its costs incurred as the prevailing party, amounting to $3,618.37 and attorney's fees in the sum of $18,985.02, all of which the court finds to be reasonable.
We have consistently held that attorney's fees are only available when authorized by a "rule, statute, or contract." See, e.g., Ace Truck v. Kahn, 103 Nev. 503, 512 n. 4, 746 P.2d 132, 138 (1987). Within the stated criteria, the decision to award attorney's fees is left to the sound discretion of the district court. County of Clark v. Blanchard Contr. *74 Co., 98 Nev. 488, 492, 653 P.2d 1217, 1220 (1982). However, a district court may abuse its discretion when it clearly disregards guiding legal principles. Franklin v. Bartsas Realty, Inc., 95 Nev. 559, 562-73, 598 P.2d 1147, 1149 (1979) (citing Goodman v. Goodman, 68 Nev. 484, 489, 236 P.2d 305, 307 (1951)).
Although the counterclaim appears to be a recitation of NRS 18.010(2)(b),[4] the district court specifically awarded attorney's fees as damages under Torosan's counterclaim. Hence, the award was not made pursuant to a "rule, statute or contract," and constitutes an abuse of discretion. In the absence of a contract or rule, a prevailing defendant/counterclaimant may only recover attorney's fees when the requirements of NRS 18.010(2)(b) are met. To allow attorney's fees as an element of damages from an ostensible common-law cause of action we have not yet embraced would swallow the purposes for the attorney's fees statute. In any event, our review of the record indicates that Torosan was properly named as a defendant to the underlying action; therefore, NRS 18.010(2)(b) is inapplicable and the award of attorney's fees is reversed.

4. Costs

Torosan prevailed against Fields and is unquestionably entitled to costs pursuant to NRS 18.020(3).[5]See Randono v. Turk, 86 Nev. 123, 133, 466 P.2d 218, 224 (1970) (the statutory award of costs is mandatory). Unfortunately, the method by which the district court awarded Torosan's costs failed to recognize the need for Torosan to file a memorandum of costs as required by NRS 18.110(1).[6] Indeed, the district court specifically found that compliance with the statute was unnecessary because costs were awarded as damages under Torosan's counterclaim and not pursuant to the statute regarding costs. Although we recognize that noncompliance with NRS 18.110 would ordinarily require the forfeiture of costs, under the peculiar circumstances of this case we will allow the cost award to stand since Fields must prevail on her claim that the award should be passed through her to the nonprevailing defendants. Therefore, we affirm the award of costs in the amount of $3,618.37.
Finally, as noted above, Fields contends that the district court erred when it failed to pass Torosan's costs through her to the nonprevailing defendants. We agree. In the analogous case of Schouweiler v. Yancey Co., 101 Nev. 827, 712 P.2d 786 (1985), the plaintiff prevailed against three of the six defendants and this court allowed the plaintiff to recover the taxable costs of the prevailing defendants from the nonprevailing defendants. Id. at 832, 712 P.2d at 789. The rule in Schouweiler is applicable here. Accordingly, we conclude that Fields may tax the costs of Torosan's defense against respondents Midwest, Reiger and Hilt.

CONCLUSION
For the reasons heretofore discussed, the district court used the wrong measure of damages when it calculated the value of Fields' services. We therefore modify the *75 damages award to Fields by increasing the amount of the award to $450,000.00. The district court's judgment awarding attorney's fees is reversed and vacated, and the award of costs favoring Torosan is affirmed but assessed against the nonprevailing defendants rather than Fields. The judgment entered below with respect to the fraud claims is affirmed. This matter is remanded to the district court for modification of the judgment in accordance with the dictates of this opinion.
ROSE, C.J., and SPRINGER and SHEARING, JJ., concur.
YOUNG, Judge, concurring in part and dissenting in part:
Although I concur that the district court used the wrong quantum meruit valuation method, I respectfully disagree with my colleagues' assessment of damages on appeal. Over my several years as a jurist, I have tried to remain true to a fundamental principle of appellate review: courts of appeal should spend their working hours deciding issues of law and not issues of fact. Only on rare occasions and under the most egregious circumstances ("clearly erroneous," "manifestly wrong" or "abuse of discretion") should we disrupt the factual rulings of the district court. It is on even rarer occasions that this court should peruse the record on appeal and redecide issues that are specifically reserved for the trier of fact.
In the instant case, the majority has spurred this dissent by straying from these fundamental concepts and tangling with an animal that is uniquely bred for trial court taming  damages. See Nelson v. Reinhart, 47 Nev. 246, 219 P. 554 (1923) (issue of value of services performed by broker is a question uniquely reserved for trier of fact). In an attempt to work justice and arrive at an equitable solution to Fields' claim for quantum meruit, the majority reweighs the evidence that was before the trial court and concludes that Fields is entitled to a $450,000.00 real estate commission. This is an additur of nearly $350,000.00. My colleagues hold that the percentage-based commission represents the customary practice in the industry and drives the brokerage fee quantum meruit determination.
I respectfully submit that the majority's application of this calculation method is erroneous. There is a bedrock principle of contract damages restricting Fields' recovery that is absent from the majority opinion. The litigant can only recover damages that the contract would provide. In the absence of a contract, I contend that Fields can only recover in quantum meruit what the sale of the investment property would have provided. The ultimate sale to Bodysonic for $5,325,000.00, which the district court held was "procured" by Fields, simply would not allow for a percentage-based commission.
If the majority feels compelled to reevaluate issues of fact and establish a commission amount on appeal, I submit that the proper calculation method would be the "net listings" or "flat fee" commission. Fields' expert testified that this type of commission was customary and common in the industry. This court has even recognized and upheld the net listing commission in the quantum meruit context. See Close v. Redelius, 67 Nev. 158, 215 P.2d 659 (1950). Under this type of arrangement, the broker is simply paid a flat fee over and above a prearranged net sales price. In other words, the seller tells the broker, "I must realize a net sale of $5,250,000.00, and any sales price you can obtain over and above this amount is your commission."
Midwest demanded a net sale of $5,250,000.00. Midwest would not consummate any deal if it could not obtain such an amount. Fields realized this fact, Bodysonic realized this fact, and the district judge realized this fact. There are several purchase offers and an expired listing contract lying in a trash bin in fields' office as a result of Midwest's steadfast demand. Yet after today's decision, and after Midwest has absorbed the $450,000.00 commission that it must pay Fields, Midwest has obtained a net sale of only $4,875,000.00 ($5,325,000.00 minus $450,000.00). This is $375,000.00 below its demand. Is this equity? Is it fair for Midwest to pay a commission based upon a hypothetical deal that it would never have consummated?
*76 Quantum meruit should not be restrained by such an obdurate shackle as percentage-based commission in every real estate broker fee case. See, e.g., Close, 67 Nev. at 167-68, 215 P.2d at 663 (quantum meruit net sale commission was appropriate even though amount was "slightly more than one-half of the charge usually made by a broker for selling business property"); see also Romanek-Golub & Co. v. Anvan Hotel Corp., 168 Ill.App.3d 1031, 119 Ill.Dec. 482, 522 N.E.2d 1341 (1988) (affirming five percent quantum meruit commission even though testimony indicated that ten percent commission was customary); and Weichert Co. Realtors v. Ryan, 128 N.J. 427, 608 A.2d 280 (1992) (in remanding for proper determination of brokerage fee, court holds that reasonable value of fee includes, but is not limited to, customary fees for similar transactions). Quantum meruit is an equitable principle that is applied at the hands of the trial judge after considering the respective positions of the parties. The district court understood that Midwest would never have solidified the sales transaction without netting $5,250,000.00. As a result, the district court specifically rejected a percentage-based commission. The amount was too high and repugnant to the negotiations and efforts of the parties. More importantly, the court realized that the percentage-based commission would have given life to a listing agreement between Midwest and Fields that was dead and withered on the vine.[1]
Neglecting the foregoing, the majority spreads their hands across the vineyard, breathes life into the listing agreement, and makes wine for Fields. My colleagues conclude that the "primary source for resolving this issue [quantum meruit] is the original listing agreement between Fields and Midwest." Yet in their supporting calculations and rationale, they neglect the very fiber of that agreement. Midwest had to have a $5,250,000.00 net sale.
As I have indicated, if the majority feels some compulsion to establish a commission based upon a paper record, the more appropriate method of valuation is the "net sales" approach. This approach is more consistent with the district court's findings of fact and seems mandated by the months of negotiations throughout which Midwest steadfastly demanded a $5,250,000.00 net sale. If a commission must be determined on appeal, Fields was entitled only to the amount of money Midwest realized over this demand or $75,000.00 (eventual sale price to Bodysonic, $5,325,000.00, minus the net demand of $5,250,000.00). This is a more equitable figure than that generated by the majority and a more accurate reflection of the negotiations that preceded the eventual sale of the investment property. Fields cannot recover anything greater than the sales transaction would provide.
Casting aside any temptation to determine damages on appeal, however, I would remand to the trial court for further proceedings. The district court heard the testimony of the parties, evaluated the witnesses, and contemplated all of the evidence presented at trial. As a result, the district court is in a better position to make the equitable decisions needed to resolve the quantum meruit dilemma presented by this case.
The majority recognizes that both the net sales and percentage-based commissions are customary in the industry. Moreover, we all agree that the district court abused its discretion in assessing damages by neglecting these customary practices. Yet why take that additional step and choose among these two equally acceptable valuation approaches and engage in an application process on appeal? By balancing the equities, I submit that the majority reaches a decision that is contradictory to the facts of this case and the integrity of the district court's decision. For example, my colleagues state that "[u]nfortunately, in fashioning a transaction through Torosan to Bodysonic without provision for a commission to Fields, Midwest foreclosed the propriety of using Midwest's net listing requirement as a fair measure of the reasonable value of Fields' services." They continue and conclude that "Fields' position is endowed *77 with a greater measure of equity and principle than that of Midwest." The majority is suggesting that Midwest was engaged in chicanery and was therefore prohibited from claiming that Fields could only recover a net sales commission. This type of equitable reasoning is contradictory to our conclusion that the district court properly determined that there was insufficient evidence to support Fields' claims for fraud and fraudulent conveyance. On the one hand, the majority posits that Midwest fashioned a suspect deal through Torosan and therefore equity demands a $350,000.00 additur for Fields. On the other, the majority agrees with the trial court that the deal through Torosan was not suspect for the purposes of evaluating Fields' fraud-based claims for relief.
This inconsistency aptly illustrates my point that this court is in no position to sift through the record on appeal and make equitable determinations that are best reserved for the trial court. I would remand and allow the district court to assess which party is endowed with the more equitable position and then have the district court determine what type of commission Fields was entitled to  a percentage-based or net sales commission. Both are customary in the industry.
For the foregoing reasons, I respectfully dissent from the portion of the majority opinion that establishes, with no little spirit of innovation, a quantum meruit amount on appeal.
NOTES
[1] Fields was working as an agent for Appellant Flamingo Realty at all relevant times. For stylistic ease and clarity we will refer to the two parties as "Fields."
[2] After the first negotiations failed, Midwest incurred approximately $75,000.00 in predevelopment architecture and engineering fees. As a result, Midwest increased the selling price to $5,325,000.00 in order to realize its earlier net requirement of $5,250,000.00.
[3] The district court stated at one point: "I'm not interested in what is customarily done. I'm interested in learning what just compensation would be based upon the services performed by Terry Fields."
[4] NRS 18.010(2)(b) provides:

2. In addition to the cases where an allowance is authorized by specific statute, the court may make an allowance of attorney's fees to a prevailing party:
(b) Without regard to the recovery sought, when the court finds that the claim, counterclaim, cross-claim or third-party complaint or defense of the opposing party was brought without reasonable ground or to harass the prevailing party.
[5] NRS 18.020 provides in pertinent part:

Costs must be allowed of course to the prevailing party against any adverse party against whom judgment is rendered, in the following cases:
3. In an action for the recovery of money or damages, where the plaintiff seeks to recover more than $2,500.
[6] NRS 18.110(1) provides:

1. The party in whose favor judgment is rendered, and who claims his costs, must file with the clerk, and serve a copy upon the adverse party, within 5 days after the entry of judgment, or such further time as the court or judge may grant, a memorandum of the items of his costs in the action or proceeding, which memorandum must be verified by the oath of the party, or his attorney or agent, or by the clerk of his attorney, stating that to the best of his knowledge and belief the items are correct, and that the costs have been necessarily incurred in the action or proceeding.
[1] The original listing agreement binding Fields and Midwest was signed on September 7, 1990. By the agreement's own terms, it expired two weeks later on September 20, 1990, and more than four months before the property was eventually sold to Bodysonic.