J. R. SIMPLOT COMPANY, APPELLANT, *v.* DALLAS RUPE & SON, INC., RESPONDENT.

No. 4422

March 8, 1962                           369 P.2d 445

*Belford, Anglim & Brown,* of Reno, for Appellant.

*Woodburn, Forman, Wedge, Blakey & Folsom,* of Reno, for Respondent.

**OPINION**

By the Court, BADT, C. J.:

This is an appeal from a judgment in favor of Dallas Rupe & Son, Inc., hereinafter referred to as Rupe, in the sum of $110,000 against J. R. Simplot Company, hereinafter called Simplot, for a commission for obtaining purchasers of $5,500,000 of Simplot's bonds. Simplot's defenses to the action and its grounds assigned for reversal are hereinafter discussed at length. We have decided that the assignments of error are without merit and that the judgment must be affirmed.

Rupe, a Texas investment banking corporation, and Simplot, a Nevada corporation with manufacturing, processing, mining, agricultural and timber interests, tentatively agreed in June 1958 that Rupe would raise a $4,500,000 loan for Simplot for a 2 percent commission on the amount thus raised. On September 2, 1958 a written "preliminary underwriting agreement" was entered into, reciting Simplot's desire to liquidate its presently outstanding funded indebtedness, and to raise additional operating capital and to negotiate the sale of $4,500,000 first-mortgage bonds, and that Rupe agreed to sell or underwrite the sale of such bonds secured by a first mortgage and chattel mortgage on

all its real and personal property. Right of prepayment of $1,000 or any multiple thereof on any semiannual interest-payment date after 60 days' written notice was permitted on a 5 percent penalty basis within one year and reduced at the rate of one half of 1 percent for each year thereafter, with no prepayment penalty after ten years. Prepayment of larger sums under certain specified conditions was permitted without penalty. The bonds were to bear interest not in excess of $5\frac{3}{4}$ percent, payable semiannually, with interest on past due payments at 8 percent. "The Bankers shall submit the application for such loan on a basis of interest at the rate of $5\frac{1}{2}$ per centum per annum but in the event they conclude that they are unable to sell such bonds at such interest rate, they shall notify the Company that in their opinion it is necessary to increase such interest rate offered on the bonds to a rate not in excess of $5\frac{3}{4}\%$ per annum and upon the approval of the Company, the Bankers shall be authorized to increase such offered rate." Provision was made for the physical form of the bonds, the selection of a trustee, and that the bonds should contain such terms, conditions, provisions, and covenants "and such other special provisions which may be made a part of a further and supplementary underwriting agreement and shall be mutually agreed upon by the parties hereto." It provided for submission and examination of abstracts of title and that the obligation of Rupe to purchase the issue should be subject to the approval of its counsel as to validity.

Paragraph 7 is as follows: "Bankers agree that they will use the facilities of their organization to offer said bonds for sale to their customers, but in the event they fail to effect the sale thereof within ninety days from date hereof, the Company may, at its option, terminate and cancel this agreement and the parties hereto shall thereupon have no further obligation to each other under the terms hereof. However, in the event the Bankers notify the Company within said period of time that they have underwritten or have sold such issue of bonds, this agreement shall remain in full force and effect. Any such underwriting or sale shall be evidenced

by a written commitment signed by some financially responsible insurance company or other financial institution or institutions, copy of which shall be delivered to the Company by the Bankers."

Paragraph 12 of the agreement reads in part as follows: "Contemporaneously with the delivery of a written commitment as provided for in Section 7 hereof, the Company shall pay to the Bankers as compensation for services rendered by them in connection with the sale of such bonds, a sum equal to two per cent (2%) of the principal amount of such bonds, * * *."

The parties entered into a written supplemental agreement November 6, 1958, increasing the amount of the proposed bond issue to $5,500,000. At the same time they agreed upon "other special provisions" contemplated by the original agreement. They included numerous provisions to be recited upon the face of the bonds. Such matters, however, present nothing involved in this appeal.

On November 26, 1958 the parties entered into a written "Extension of Preliminary Underwriting Agreement," section 1 of which reads as follows: "Section 7 of such Preliminary Underwriting Agreement is hereby revised to provide that in the event the Bankers fail to effect the sale of the First Mortgage Bonds referred to in such agreement on or before the 15th day of January, 1959, the Company may, at its option, terminate and cancel such Preliminary Underwriting Agreement and all amendments and supplements thereto, and the parties hereto shall thereupon have no further obligation to each other under the terms thereof. Each reference in such Preliminary Underwriting Agreement to such original period of ninety days shall hereafter be read to mean a reference to the period of time ending at the close of business on the 15th day of January, 1959." Time for Rupe's performance was accordingly extended to January 15, 1959. The provision with reference to written commitments was not altered.

On March 13, 1959 Simplot telephoned Rupe and notified him that the agreement was terminated. This was

confirmed in a letter of March 16, 1959, advising: "Pursuant to the provisions of Section 7 of the Preliminary Underwriting Agreement * * * we desire to give you notice of termination and cancellation of said agreement."

In its specification of errors in its appeal from the judgment awarding a commission to Rupe, Simplot asserts that the lower court erred in finding that Rupe had performed its contract. It asserts that there was no compliance with that part of paragraph 7 of the original agreement above quoted requiring written commitments "signed by some financially responsible insurance company or other financial institution or institutions, copy of which shall be delivered to the company [Simplot] by the bankers [Rupe]." Analyzing this contention, Simplot refers to the amounts that were to be purchased by the four lenders supplied by Rupe as follows:

| American National Insurance Company | $1,500,000 |
| Northwestern National Life Insurance Co. | 800,000 |
| Seattle First National Bank | 1,800,000 |
| Northwestern Mutual Life Insurance Company | 1,400,000 |
| Total | $5,500,000 |

Taking these in order, Simplot attacks each one as failing of compliance with paragraph 7 of the agreement. It asserts that American National made nothing but a conditional agreement to participate. American National's letter was as follows: "This is to let you know that the Finance Committee of the American National Insurance Company has approved at their meeting this morning a participation up to $1,500,000 in the first mortgage loan to the J. R. Simplot Company amounting to $5,500,000. This loan is contingent upon the interest rate on the bonds which we purchase being not less than 5¾%, as well as other terms and conditions being worked out along the lines of previous

telephone conversations. In addition, the loan is also contingent upon a final personal inspection by the writer at the earliest possible date. Also, as mentioned over the phone our participation is contingent on the participation by other satisfactory lenders in the total amount of the loan $5,500,000." Simplot contends that the contingency of the 5¾ percent interest rate, the contingency of other terms and conditions being worked out along the lines of previous telephone conversations, the contingency of a personal inspection and the contingency of the participation by other satisfactory lenders in the total amount of $5,500,000, all show conclusively that this is simply a conditional or contingent undertaking and not the "commitment" contemplated by the contract. However, the 5¾ percent interest rate was thereafter agreed upon by the parties; it is entirely unreasonable to contend that Simplot expected to obtain a loan of $5,500,000 without inspection; the necessity of working out terms and conditions along the lines of previous discussions added no additional condition; and the participation of other companies for the aggregate bond purchase was anticipated under paragraph 7 of the agreement, indicating a participation by some financially responsible insurance company or other financial institution *or institutions*. The parties never contemplated, as is clear from their acts and statements, anything but an aggregate of $5,500,000 from several lenders. It is our conclusion that the commitment of American National Insurance Company was in compliance with the agreement.

Northwestern National Life Insurance Company committed itself by letter as follows: "Today our Finance Committee approved a participation of $800,000 in the proposed financing for J. R. Simplot, subject to placement of the remaining portion of $4,700,000, making a grand total of $5,500,000 of financing. This commitment is further subject to the working out of a mutually satisfactory note agreement along the lines spelled out in your application for financing dated October 10, 1958." Appellant attacks this as not being a commitment

but as being likewise conditional. The first condition is the placement of the remaining $4,700,000 by others. This we have disposed of above. The second asserted condition that the commitment is further subject to the working out of a mutually satisfactory note agreement along the lines spelled out in Simplot's application likewise presented no new condition. The October 10, 1958 "Application for Financing" by Simplot is a document almost 40 pages long giving a history of the business and organization of its sundry divisions, its subsidiaries, stock ownership, officers and directors and key personnel, and the security behind the loan, with extensions of valuation for the various items showing a grand total for all properties in the sum of $14,155,730. It contains an unaudited balance sheet as of July 31, 1958 showing total assets of $17,001,460, as well as an earlier balance sheet, and a statement of audited income for the years 1954 to 1958.

The July 31, 1958 balance sheet showed an item of cash in the sum of $596,292. A "Pro Forma Balance Sheet" of the same date, reflecting the new loan, shows cash of $675,292. Balance sheet of February 28, 1958 shows cash of $1,148,371. Notes to the financial statements discussed in detail a $2,500,000 long-term note to Prudential Insurance Company of America, the company's agreement in connection therewith to maintain a certain excess of current assets over current liabilities, to limit sales and assets other than products, to limit dividend payments, etc. The February 28, 1958 pro forma statement showed outstanding demand bank notes for $4,500,000, borrowed under the terms of a 6 percent bank credit agreement. That the contemplated refunding issue should be without limitation of any kind and without a mutually satisfactory note agreement (as indicated in the several indebtednesses to be refunded by the new issue) cannot reasonably be written into the contractual requirement for "commitment" referred to in paragraph 7 of the underwriting agreement.

Rupe does not contend that Seattle First National Bank ever forwarded a written commitment to Simplot.

In this regard the trial court's written opinion said: "It appears from the record, however, that Robert Beaupre of that Bank advised defendant Simplot by telephone on February 25, 1959 that his Bank would participate in the amount of $1,800,000.00 at $5\frac{3}{4}\%$. There seems to be no question but what Seattle First National Bank considered itself sufficiently 'committed' to work out the details of the loan agreement and in fact referred to the 'Commitment' in Exhibit 2, a letter from Beaupre of Seattle First National Bank to plaintiff. It further appears that a written letter of commitment would have been forthcoming if such a request therefor had been made."

Rupe has contended throughout that oral and written negotiations were continuously in progress to the time of Simplot's notice of cancellation of the agreement, and that written commitments from Seattle First National Bank and Northwestern Mutual Life Insurance Company could have been obtained on short notice if requested, and that the continuing negotiations constituted an implied extension of time and a waiver by Simplot of the immediate production of the written commitments of these two lenders.

The trial court's written opinion with respect to the commitments of the Seattle First National Bank and Northwestern Mutual Life proceeds as follows:

"Northwestern National Life Insurance likewise indicated its willingness to proceed subject to inspection and the working out of a satisfactory note agreement 'along the lines spelled out in your application for financing dated October 10, 1958. * * *' This cannot possibly constitute a qualified acceptance. Furthermore, the personal inspection never seems to have been important either to this particular transaction or any other one.

"Irrespective of the interest dispute Northwestern Mutual's commitment is likewise in order. Defendant contends that the pledge of stock of subsidiaries is at variance with the original contract and yet in Exhibit D, the application for financing, we find 'Security Behind This Loan: The extensive and diverse properties

owned by the J. R. Simplot Company will be offered as security for this loan * * *.'

"Similarly a careful analysis of all the other claimed qualifications indicates to me that they are unfounded. For instance, it is claimed that the redemption clause— 6% penalty through the first five years and declining thereafter is at variance with Paragraph 2 of the 'Preliminary Underwriting Agreement.' This is true and yet the Supplemental Agreement * * * and the attached 'Memorandum Defining Special Covenants,' Paragraph 17, which contains revisions of covenants of Loan Agreement specifically states that Paragraph 5, relating to prepayments 'shall be revised in accordance with terms agreed upon by purchasers of the bonds.' Obviously, defendant must be bound by that.

"With respect to the claimed qualifications 'no redemptions may be made from or in contemplation of funds borrowed at a lower interest rate' which, it is claimed, is not contained in the basic contract, it first may be said that Paragraph 17 above quoted must necessarily control. More important, Paragraph 5 of Exhibit A clearly gives Bankers, plaintiff or their counsel, right to fix certain terms and conditions as 'shall be usual and customary in transactions of such character,' which provisions of Northwestern Mutual were usual and customary so far as I can tell, no evidence appearing to the contrary.

* * * * *

"Since it is claimed and likewise admitted that Seattle First National never presented a written commitment within the terms of Exhibit A reference must be made to the record to determine whether or not a waiver of the written requirement took place.

"Mr. Simplot visited with Mr. Beaupre and the Senior Loan Committee of the Bank on February 11th or 12th, 1959, at which time there was a considerable discussion over the loan application. Thereafter, Beaupre along with Dennard made a personal inspection of the J. R. Simplot plant. Following that the Senior Loan Committee approved the loan as to term, amount and interest

rate. On or about February 25, 1959, Beaupre called
Simplot, advised him that the Senior Loan Committee
had approved the loan. Apparently nothing was dis-
cussed as to prepayment penalties, for the Bank's prac-
tice did not require it. There was a discussion, however,
as to compensating balances, but nothing was especially
set. There is an admission that a written letter of com-
mitment would have been given to plaintiff after Feb-
ruary 25, 1959 if it had been desired. But there is no
evidence that it was. Perhaps defendant's cancellation
of the loan application forestalled a written commit-
ment."

Simplot contends that the Northwestern Mutual Life
Insurance insisted on a 6 percent interest rate, con-
trary to the terms of the underwriting agreement. This
received the particular attention of the trial court, which
said in its opinion:

"Actually, there is no dispute as to $5\frac{3}{4}\%$ rate on
three of the loans. There is a decided dispute, however,
as to the 6% on the Northwestern Mutual loan. In fact,
defendant denied that he ever approved a 6% rate. Since
there is an admitted conflict in the evidence, I suppose
that one must determine wherein the truth lies by
reviewing pertinent portions of the testimony.

"It appears that defendant knew of the Northwestern
Mutual 6% commitment on February 2, 1959 when Den-
nard, of Rupe, telephoned [Simplot], advised him of the
6% interest rate and also a 6% prepayment penalty,
inquired whether the 6% interest rate was agreeable,
and although it seems defendant remonstrated he appar-
ently, according to Dennard, agreed and since an inspec-
tion trip was in the offing by Scrivener of Northwestern
Mutual, the necessity therefor continued and from then
on arrangements were made for the inspection trip by
Scrivener, Dennard and Beaupre on February 13, 1959.
If the new interest rate was not acceptable one may
well ask: why the defendant did not tell them the trip
was off. Defendant notwithstanding knowledge of a 6%
interest, and this appears from his deposition read into
the record by way of impeachment, made a trip over
to Seattle, evidenced every intention of proceeding with

the loan and personally met Scrivener and the other gentlemen at his home in Boise, where the inspection trip took place.

"It also appears from plaintiff's testimony that defendant told Rupe that Northwestern Mutual's 6% interest rate and prepayment penalty were agreeable and that he expressed such acceptance to Dennard again. Nowhere is there any testimony that he rejected the Northwestern offer. From the evidence presented, from the fact that additional information was submitted to Scrivener, through John M. Dahl, defendant's Agent, it is reasonable to conclude that defendant agreed to a 6% interest rate even though it might be of some additional cost over the years."

The trial court further said:

"The sale of $5,500,000.00 of financing was to be evidenced by written commitments from responsible financial institutions. Defendant says only three qualified letters of commitment were produced and one qualified intention by telephone. Since I have heretofore decided that the written letters of acceptance were proper commitments, up to that point at least, plaintiff had complied with the Underwriting Agreement. With respect to the oral telephone commitment, it was considered as such [a written commitment] by defendant and thereafter relied upon by plaintiff. I am satisfied that a situation had been reached in the not inconsiderable course of an involved financial transaction when the final details were well on the way to being completed. Although defendant had the option to terminate after January 15, 1959, he actually did not exercise that right until March 13, 1959, notwithstanding the fact that the commitments had been firmed up."

The trial court's formal finding in this respect was as follows:

"Plaintiff secured a commitment from the Seattle First National Bank, of which the said bank and plaintiff each notified defendant, for the amount of $1,800,000 at 5¾% interest. Defendant intended to waive the requirement that this commitment be reduced to written form and delivered to it. The commitment of Seattle

First National Bank would have been reduced to writing and delivered to defendant had it not waived such requirement, and had it made request that such be done. The reduction of the commitment of Seattle First National Bank to written form, and delivery thereof to defendant, was forestalled by defendant by the repudiation on May 13, 1959 of the Preliminary Underwriting Agreement, as supplemented, extended and amended."

Rupe's contention that Simplot had extended time for compliance, and Simplot's denial thereof, are closely tied together. In this regard the trial court stated:

"There doesn't seem to be any serious dispute among the parties hereto that the Preliminary Underwriting Agreement was not terminated, ipso facto, on January 15, 1959 in view of the fact that Simplot could terminate after that date only by giving notice which was not given until March 13, 1959. Furthermore, there was so much activity after January 15, 1959, openly acquiesced in by Simplot, that the only fair construction of the evidence on this point is that the option to terminate and cancel was not in fact exercised until March 13, 1959 during which time the Preliminary Underwriting Agreement was in effect."

A careful consideration of the depositions on file, the testimony of the witnesses, the correspondence of the parties, and other numerous exhibits convinces us that the trial court's findings find ample support in the record.

Accordingly we approve the trial court's conclusion as follows:

"That the securing of a 'commitment,' as that term is used in the Preliminary Underwriting Agreement, as supplemented, extended and amended, is a preliminary step to the working out of the final terms of the loan agreement and other closing papers, under the terms of the Preliminary Underwriting Agreement, as supplemented, extended and amended. Such agreement continued in full force and effect after plaintiff gave defendant notice that it had secured commitments for the sum of $5,500,000 from the lending institutions, and

at such time defendant became legally bound to pay plaintiff, for the latter's services, 2% of $5,500,000."

In the view we have thus taken, it becomes unnecessary to discuss how other authorities define a "commitment" or the lexicographers' definition of the word. Neither do we find it necessary to discuss the holdings of various courts to the effect that to entitle a broker to a commission "the acceptance of the buyer's purchase must be unconditional." These statements of law do not fit the facts of this case. Boiled down to its simple fundamental, Simplot contends that it was entitled to cancel the agreement because the commitments relied upon by Rupe were qualified and conditional and not a compliance with the requirements of the contract. We are in complete accord with the trial court's findings and conclusions to the contrary on this fundamental issue.

The judgment is affirmed.

McNAMEE, J., and GREGORY, D. J., concur.

Mr. Justice THOMPSON being disqualified, the Governor commissioned Honorable Frank B. Gregory, judge of the First Judicial District, to sit in his place.