FRANK HUMPHREY, APPELLANT, *v.* JOHN T. KNOBEL AND MARIE E. KNOBEL, RESPONDENTS.

No. 4462

March 20, 1962                    369 P.2d 872

*R. P. Wait & E. J. Wait, Jr.,* of Reno, for Appellant.

*Vargas, Dillon & Bartlett* and *Alex. A. Garroway,* all of Reno, for Respondents.

# OPINION

By the Court, BADT, C. J.:

The parties will be referred to by their abbreviated names. Humphrey, a real estate broker, entered into a written contract with Knobel whereunder the former was given an exclusive listing for a period of 60 days from June 30, 1957, in which to sell a home owned by Knobel in Reno, Nevada, the listing price being $31,500. The contract describes the property, then recites: "Price: 31,500 Down:_____ Enc:_____ Committt:_____." It then proceeds as follows: "Date: June 30, 1957, Listing: Exclusive By FEH. In consideration of Frank Humphrey, Broker, advertising or otherwise undertaking to find a purchaser for the property described above, and on the terms and conditions stated herein, I/we hereby grant and give to Frank Humphrey an exclusive right  *  *  *  to sell said property for a period of Sixty days from date and authorize him to accept a deposit thereon. If a sale is effected during period of above agency, I agree to pay Frank Humphrey Five % of the gross selling price as commission for Agent's services and to furnish buyer at my expense a standard owner's policy of Title Insurance. Receipt of a copy of this listing is hereby acknowledged. Owner: J. T. Knobel.

Above agency is hereby accepted and Agent agrees to use diligence in procuring a buyer.

Frank Humphrey
By s/Frank Humphrey
Agent

This Agreement excludes Dr. Callister as possible Buyer as he has already been approached by Mr. Knobel.
   "U.F. loan between

   14–1500 U.F.              Payment around $131.00"

Humphrey posted a sign on the property showing that it was for sale through him as the real estate agent. On August 3, 1957 one Larson and his wife examined the property, made contact with Humphrey at the latter's office and offered $30,000 for the property, $3,000 down, $7,000 to be paid upon sale of Larson's home in Winnemucca, Nevada, and the balance represented by note secured by deed of trust. Humphrey advised the Larsons that he did not believe Knobel would accept their offer but that he would take it up with Knobel. Humphrey communicated the offer to Knobel, who refused to accept it. Humphrey so advised the Larsons but gave them Knobel's name, address, and telephone number and suggested that they contact him. He told them: "This type of offer I'm sure is something that Mr. Knobel is not particularly interested in. However, there is the possibility that he might. You may go and see him if you wish." Mrs. Larson subsequently called Humphrey, indicating her desire to purchase the property and to work something out so as to be able to buy it. Thereafter Larson contacted Knobel and made the same offer he had made to Humphrey. Knobel said to him: "I have a real estate agent at this point who is negotiating for a deal. You're not offering the total amount of my request," or "my indication of the total price to him." "It's pretty much up to him to make a decision." Such is the conversation as reported by Larson. However, Larson continued to negotiate directly with Knobel in August and early September.

On September 14, 1957, the 14th day after expiration of the 60-day exclusive listing, the Larsons and Knobel met and a contract of sale and escrow instructions were executed for the sale of the property for a total purchase price of $30,000, being $3,000 down, $7,000 in cash upon the sale of the Larsons' Winnemucca property, and the remainder by assumption of a bank loan and deed of trust. This was the same offer as had been made by Larson to Humphrey on August 3, 1957.

Upon Knobel's refusal to pay Humphrey a commission, Humphrey commenced this action, alleging in his first cause of action a breach of the contract, a second

cause of action on quantum meruit, a third cause of action based on fraud, and a fourth cause of action against the Larsons for alleged interference with Humphrey's contractual rights under the contract. We are concerned here only with the action for breach of the contract to pay Humphrey's commission in the sum of $1,500. The trial court denied Humphrey any relief and found for the defendants. The Larsons are not concerned with this appeal, which is taken only from the judgment in favor of Knobel.

In Palmtag v. Danielson, 30 Cal.2d 517, 183 P.2d 265, the case to which we shall make considerable reference later, the court said: "The question presented on this appeal is whether the agreement between the parties was a general contract merely stating an asking price or a special contract calling for a purchaser willing to pay a net minimum price."

We consider that the question presented to us is precisely the same. Appellant so considers it, although both the trial court and respondent consider the question in much simpler terms. The learned trial judge quoted the rule stated in Ramezzano v. Avansino, 44 Nev. 72, 189 P. 681, "that before a broker can be said to have earned his commission, he must produce a buyer within the terms of the agency, when the time is limited, ready, willing and able to purchase at the price designated by the principal." He then stated: "Admittedly this rule is qualified by the principle that if fraud defeats the broker's efforts the general rule does not apply. It was therefore incumbent upon the plaintiff to procure a purchaser ready, able and willing to buy the premises upon the terms set forth and within the exclusive time limit unless evidence shows that the defendants fraudulently conspired to prevent the broker from accomplishing his purpose."[1]

After distinguishing Ramezzano v. Avansino, supra, in which case fraud was shown, the learned trial judge concluded: "This case can be decided on one of two

[1]The contract in Ramezzano v. Avansino was for a net price. It was a special contract. Such was likewise the case in Close v. Redelius, 67 Nev. 158, 215 P.2d 659.

theories, first that the broker did not procure a buyer ready, able and willing to buy within the terms of the contract; or (2) that there is no evidence to show a fraudulent scheme or design to show the defendants purposely defeated plaintiff's right to a commission." The court then concluded that there was no proof that the defendants acted fraudulently and that the plaintiff had failed to meet the burden of proof sufficient "to take this case out of the general rule."

The respondents analyze the case even more simply. Counsel for respondents in his oral argument stated: "I don't care whether this is a general or special contract. We are dealing with *a contract*. That contract was to get $31,500. The broker didn't get it. To earn his commission the broker must succeed, not fail."

The issue cannot be disposed of as simply as analyzed by either the court or by respondents. There has grown up over the years a large body of law having to do with brokers' contracts for the sale of real property. Although the application of the facts to the hundreds of cases decided under this special branch of the law of contracts cannot be said to be in agreement, one controlling principle has come to be generally recognized. This principle is expressed in Palmtag v. Danielson, supra, as follows: "*Ordinarily,*[2] the price at which a broker is authorized to sell property is considered merely an asking price to guide the broker in his negotiations with prospective purchasers. See Rest. Agency, § 447, Comment b. If the broker procures a purchaser willing to pay a lower price, the owner cannot deprive the broker of his commission by conducting the final negotiations himself and selling at a lower figure to the purchaser procured by the broker. See 128 A.L.R. 430; Leicht-Benson Realty Const. Corp. v. J. D. Stone & Co., 138 Va. 511, 121 S.E. 883, 43 A.L.R. [1100] 1103.

"An owner is entitled, however, to make a special contract with the broker whereby the latter is required to

[2]Emphasis supplied in all instances where appearing in this opinion.

procure a purchaser willing to pay a particular price or meet specific conditions imposed by the owner. In such cases, if the owner sells the property to a purchaser procured by the broker, but on different terms from those stated in the contract, the broker is not entitled to a commission in the absence of bad faith. Backman v. Guadalupe Realty Co., 78 Cal.App. 347, 353, 248 P. 296. In brokers' net contracts, a fixed net amount must be paid to the owner and the broker's compensation is limited to the excess of the payment by the purchaser over the net amount specified. Haigler v. Donnelly, 18 Cal.2d 674, 678, 117 P.2d 331."

The A.L.R. note cited by the California Supreme Court is but a continuation and extension of a number of extended A.L.R. and L.R.A. annotations giving many examples in which the various courts concluded in effect that the contract in question was either a general contract or a special contract.

It must be said in justice to the learned trial judge that his opinion and judgment denying the broker a recovery when he had failed to produce a ready, able, and willing buyer *for the price set and within the time provided in the brokerage contract,* in the absence of fraud or bad faith, finds support in a great many cases. On the other hand, where the broker has been the procuring cause (a term apparently used interchangeably with "efficient cause" and "proximate cause"), although the transaction was actually closed by the owner directly with the buyer at a price less (sometimes the same, sometimes more) than the sum indicated in the brokerage contract and within a reasonable time after the expiration term of the contract, although without fraud or bad faith, recovery by the broker has been permitted. We have concluded that the latter rule is best supported on reason and the great weight of authority.

This conclusion on our part is, we think, based upon a better appreciation of those principles which many cases have placed foremost as resulting in a fair and just determination under the facts of each case. That the determination is a difficult one cannot be doubted. As was recently said in an article appearing in 8 Ark.L.

Rev. 156, "A further dissection of the body of the law unveils a subject so fraught with conflict and enigmatic confusion as nearly to defy analysis." The author then states that the chaos is only a manifestation of an attempt by the courts to maintain a delicate balance among the elements of cause and effect, public policy, a requirement of good faith, the danger of unjust forfeiture, and the specific provisions of brokerage contracts. And in Havens v. Irvine, 61 Wyo. 309, 157 P.2d 570, it was stated: "The cases on the right of a broker to recover a commission are very numerous, and seemingly confusing, even in cases from the same state."

It is significant that the subject of brokers' contracts is not included in the texts and treatises as a part of the law of contracts. It is given a separate title and separate treatment. It would be an easy disposition of the vast majority of appeals in cases involving brokers' contracts, to set against the precise terms of the contract the extent of the broker's performance and to conclude, in the absence of fraud, that the performance as shown by the facts did or did not meet the requirements of the contract—quod erat demonstrandum. The cases however do not admit of such arithmetical or syllogistic conclusion. It was said in the early case of Plant v. Thompson, 42 Kan. 664, 22 P. 726, citing numerous earlier cases, that it was sufficient to entitle a broker to compensation that the sale was effected through his agency as the procuring cause, and that if his communications with the purchaser were the cause of bringing him and the owner together and the sale resulted in consequence thereof, the broker was entitled to recover, although the sale resulted from negotiations between the seller and the buyer. Such holdings have led some authors to characterize this theory as the "procuring cause" theory, under which they have virtually lifted it out of the strict law of contract.

Of course, where actual fraud appeared on the part of the owner, precise compliance by the broker with the terms of his contract was not required and recovery was permitted. The difficulty arose where no fraud existed on the owner's part and where justice was nonetheless

defeated if the broker was deprived of the profits of his labor in producing a ready, able, and willing buyer under terms which the owner eventually accepted through his own direct negotiations with the buyer. Thus it appears that a new body of law grew up dealing with brokers' contracts. It was recognized that in many if not most cases the price specified in the broker's contract was simply a suggested or asking price. The fact that the sale is made for a lesser price, satisfactory to the owner, than that specified in the broker's contract, does not affect the broker's right to a commission. In Smith v. Anderson, 2 Ida. 537, 21 P. 412, the owner sold for $6,000 against the $8,000 price given to the agent. In Warren v. Van Der Velde, 193 Mich. 164, 159 N.W. 137, the owner sold for $5,500 against the price of $5,700 given the agent. In Henschel v. Sutton, 120 Kan. 260, 242 P. 1024, the owner sold for $27,000 against the price of $33,750 given the agent. In Studt v. Leiweke, 100 S.W.2d 30 (Mo.App. 1937), the owner sold for $40 an acre against the price of $75 an acre given the agent.

The author of the note in 8 Ark.L.Rev., supra, says at p. 61: "If no specific amount is set, or if the price listed is considered, *as is usual,* to be merely an asking price and not determinative of the broker's commission, then, if other conditions are such as to warrant awarding the broker his commission, the prevailing view apparently advocates recovery, although the sale is made on considerably less advantageous terms."

Such contracts then became known to the courts as "general" contracts under which a broker was entitled to recover an agreed percentage commission if he produced a willing buyer at a lower price which proved later acceptable to the seller, and at which the seller closed directly with the buyer. Such contracts were recognized as distinct from what became known as "special contracts"[3] under which the owner specified a minimum or

---

[3] In Ramezzano v. Avansino, 44 Nev. 72, 189 P. 681, and in Close v. Redelius, 67 Nev. 158, 215 P.2d 659, the opinions of this court contributed to the recognition of "special contracts," characterized by the fixing of a net price in the broker's contract. And where the fraud of the owner prevented consummation of the sale by the broker, the full commission was allowed. Fraud was not asserted by

net price to himself. In the latter case the broker earned no commission unless he procured a buyer ready, able, and willing to pay a price that would provide the net or minimum specified by the seller.

This then is the law which recognizes the two distinct types of brokers' contracts, the nature of the distinction, and the respective rights and obligations of the parties, depending upon the type or class into which the contract falls. We have the general contract, recognized as specifying merely the suggested or asking price; and the special contract fixing a net or minimum return to the owner.

It has been suggested that the contract in question is ambiguous in view of the development of this body of law governing brokers' agreements and that the rule should be applied construing the contract strictly against Humphrey, who drew it, and liberally in favor of Knobel. However, we find no necessity of applying this rule which, according to a statement in 3 Corbin, Contracts, sec. 559 (1960 ed.), "is to be applied only as a last resort. It should not be applied until other rules of interpretation have been exhausted;  *  *  *  [and] is chiefly a rule of public policy, generally favoring the under dog." In any event, the construction would be against Knobel if the contract in question was considered a special contract. William E. Wallace, Assistant Professor of Law, Washington University, the author of an article in 13 Vanderbilt L.Rev. 675, 692, says: "While construction of a listing agreement is normally against the broker, such results from the fact that usually it is he who has authored the agreement. Where there is a 'net' listing, however, the agreement will normally have resulted from the landowner's insistence. Thus, he will be the 'maker' against whom construction generally runs."

---

the broker in Wiechmann v. Hale, 76 Nev. 492, 358 P.2d 113. It too involved a special contract. The broker had produced a buyer ready, able, and willing to close at the fixed net price, but the owner concluded the sale with the buyer and refused to pay the commission. The only significance of that case here is the court's recognition of the conflict in the authorities, and its adherence to the theory that the broker was entitled to recover as the "procuring cause."

We have no difficulty in placing the contract here under consideration within the class of general contracts. The price of $31,500 fixed by the owner may then be considered, as is usual, the suggested or asking price. Under the contract the owner covenanted: "If a sale is effected during the period of above agency, I agree to pay Frank Humphrey 5% of the *gross selling price as commission for agents' services.*" The contract contained no provision for terms or amount of down payment. When Larson with Humphrey's consent and at his suggestion contacted Knobel and made the same offer he had made to Humphrey, Knobel told him: "I have a real estate agent *at this point* who is negotiating for a deal. You're not offering the total amount of my *request*" or, "my *indication* of the total price to him." Larson testified that Knobel said: "It's pretty much up to him to make a decision—to Mr. Humphrey to make a decision in this case."

The conversation thus quoted is important in two respects. It more strongly identifies the contract as a general contract and the price of $31,500 as the suggested or asking price. It further indicates Knobel's point of view or purpose that during the specific 60-day term provided in the contract, negotiations must go through Humphrey, with the thought that after the termination of the contract Knobel would be free to make a deal in his own behalf and thus avoid the payment of a commission. On the 14th day after the termination of the contract under its terms, September 14, 1957, Knobel closed directly with Larson on the precise terms that Larson had offered to Humphrey and which Humphrey had communicated to Knobel. But before so closing, Mrs. Knobel went to Humphrey's office to obtain a copy of the contract and to make sure that the 60-day term therein recited had expired. As aforesaid, Larson had continued to negotiate directly with Knobel during August and the early part of September, 1957.

With reference to the fact that Knobel did not close the contract with Larson until the 14th day after the

expiration of the term fixed in the contract, the same principles appear to us to apply as in the cases where the owner terminates a contract containing no restrictions as to time. The cases seem to agree that where the negotiations are still going on, the contract will remain effective for a reasonable time after the term of its expiration. Southwick v. Swavienski, 114 App.Div. 681, 99 N.Y.S. 1079 (twenty days after expiration of contract) ; Jaeger v. Glover, 89 Minn. 490, 95 N.W. 311 (one month after expiration of contract) ; Kalas v. MacMahon, 36 Ala.App 238, 54 So.2d 322 (three months after expiration of contract) ; see Axsom v. Thompson, 239 Mo.App. 732, 197 S.W.2d 326. Some of these cases based their ruling on waiver where, as here, the negotiations had continued directly between the owner and the purchaser produced by the broker after the time limited by the contract had expired. See also Simplot Co. v. Rupe & Son, 78 Nev. 111, 369 P.2d 445.

Before turning further to Palmtag v. Danielson, certain important features must be considered. Although the trial court made no definite determination whether the contract in question was a general or special contract, its refusal to adjudge the broker entitled to a commission was in effect to construe the contract as one recognized in law as a special contract. In doing so, it made no factual determination in support of such construction. It did not find that the words or actions of the parties compelled an inference that it was a special contract, or that it was their intention that $31,500 was a minimum price or that $30,000 was a net price. It did not find that Humphrey did not procure the purchaser or that, having first procured the purchaser, Humphrey had abandoned the project. It did not find that the price of $31,500, with $3,000 down, $7,000 on Larson's sale of his Winnemucca home, and the balance by way of note secured by deed of trust, at which Knobel closed with Larson, was different in any respect from Larson's original offer to Humphrey. It found simply that Humphrey had not within his 60-day contract produced a purchaser at $31,500, and thus, in

absence of fraud on Knobel's part, he could not recover a commission. The court found that there was no evidence of fraud.

In Palmtag v. Danielson, supra, the listing was contained in a letter which recited: "I have a price of $40,000 on the property and if you should arrange the sale I will pay you 5% commission or a net to me of $38,000." Mr. Justice Traynor, speaking for the California Supreme Court, said: "If the phrase beginning 'or a net to me * * *' is excluded, the letter clearly states nothing more than an asking price [for] the guidance of the broker. The addition of 'or a net to me of $38,000' is illustrative of the amount that defendant would receive if the broker sold the property at $40,000. The $38,000 figure has no independent significance, but is merely the amount remaining after the commission is subtracted from the proposed sale price. Interpreted in this manner, the phrase may be explained without doing violence to the remaining language in the contract. If the contract were construed to require $38,000 net to defendant, the provision for a 5% commission would have little meaning." We may take the California Supreme Court at its word, then, and eliminate the clause "or a net to me of $38,000" as merely an arithmetical calculation or illustration of the subtraction from the gross of 5% commission. It becomes then, a fortiori, authority for the construction of the $31,500 price in the present case as a suggested or asking price. Respondent's covenant to pay *5% of the gross selling price* as commission for agent's services further confirms this.

Respondent attempts to distinguish the Palmtag case by a quotation therefrom in which the court recites the conditions under which the broker is not entitled to a commission in the absence of bad faith, but overlooks the fact that such recital is confined to a "special contract," theretofore defined as one in which a minimum price or a net price is clearly specified, a situation which the court held did not exist. It is also sought to distinguish the Palmtag case on the ground that the court in that case referred to factual conditions indicating that the $40,000 price fixed in the letter was

simply a suggested or asking price. We do not think that this weakens Palmtag as an authority. The court below in the instant case made no findings of fact to support its analysis or construction of the present contract, such as a finding that the parties, by their actions and statements, had themselves made their own construction. It is further suggested that here Knobel in accepting Larson's $30,000 offer received that sum net and that this fact indicated that he would not have accepted $30,000 if it had been subject to a 5% discount, which would have netted him only $28,500. This furnishes no helpful evidence in construing the contract; Knobel accepted the precise offer first made to him through Humphrey and again made to him by Larson, after first rejecting it. The only difference was that he avoided the payment of Humphrey's commission. On the strength of Palmtag v. Danielson, supra, we are of the opinion that the judgment must be reversed and the commission awarded.

Just as the overreaching of real estate brokers by owners was apparently what gave rise to the recognized rule which we are following in this case, it is likewise important that unwary owners dealing with experienced real estate brokers should in turn have a means of protection. This presents no difficulty. In the present case, for example, there was written in by longhand the following: "This agreement excludes Dr. Callister as possible buyer as he has already been approached by Mr. Knobel." Mr. Knobel could just as simply have protected himself (if he thought he could obtain a broker to work for him on such basis) by noting simply: "No commission unless I get $30,000 net."

Reversed and remanded with directions to enter judgment for appellant for $1,500, with interest from September 14, 1957.

McNamee, J., and Wines, D. J., concur.

Thompson, J., being disqualified, the Governor designated Honorable Taylor H. Wines, Judge of the Fourth Judicial District, to sit in his stead.