SHELL OIL COMPANY, A DELAWARE CORPORATION, APPELLANT, v. ED HOPPE REALTY INC., A NEVADA CORPORATION, RESPONDENT.

No. 7238

ED HOPPE REALTY INC., A NEVADA CORPORATION, APPELLANT, v. HUSKY OIL COMPANY OF DELAWARE, A DELAWARE CORPORATION, RESPONDENT.

No. 7320

September 22, 1975                           540 P.2d 107

*Deaner & Deaner,* Las Vegas, for Appellant Shell Oil Company.

*Goodman & Snyder, Ltd.,* Las Vegas, for Respondent Husky Oil Company of Delaware.

*Lee & Beasey,* Las Vegas, for Appellant-Respondent Ed Hoppe Realty Inc.

## OPINION

By the Court, GUNDERSON, C. J.:

These appeals follow judgment for Ed Hoppe Realty Inc. (Hoppe) against Shell Oil Company (Shell), in the sum of $15,000, representing a real estate commission on the sale of three Shell service stations. The trial court denied Hoppe relief against the buyer of the stations, Husky Oil Company of Delaware (Husky). Shell and Hoppe have appealed. Shell contends evidence at trial was insufficient to show a broker-client relationship between Shell and Hoppe, or to establish Hoppe as the "procuring cause" of the sale. Hoppe contends the contrary, and also that the evidence established a commission is due Hoppe from Husky. In our view, the record supports the trial court's determinations.

Early in 1969, Husky contacted William Hoppe, Hoppe's president, seeking expansion locations for Husky's truck stop operations. At first, Mr. Hoppe showed Husky's representatives a number of possible locations already listed with his company. Thus, it appears that if Hoppe had continued advocating these locations to Husky's representatives, rather than being led to act in Shell's interests, Hoppe might have earned and received a fee, without having to litigate over it. Moreover, Shell might still be burdened with certain service stations it regarded as "surplus," and wanted to sell—and which it ultimately sold to Husky as a result of Hoppe's efforts, for $15,000 more than it apparently hoped to receive.

Prior to the sale in question, Hoppe sent several letters to Shell and, through telephone contact, received statistical and price information concerning the stations. Although the content and import of these dealings are disputed, we must presume that the trier of fact resolved all conflicts and drew all permissible inferences in Hoppe's favor. If the evidence, though conflicting, can be read to support them, this court must approve the trial court's determinations. Fletcher v. Fletcher, 89 Nev. 540, 516 P.2d 103 (1973). Cf. Fletcher v. Garrett, 445 P.2d 401 (Colo. 1968).

From the record, the trial court could determine that, seeking listings to show Husky, Mr. Hoppe telephoned a number of

oil companies, including Shell. In Shell's case, Mr. Hoppe left a message with a secretary, stating his name, that of his company, and the matter of his interest. Shell did not rebuff or ignore this contact. Instead, evidently contemplating some sort of business relationship, Shell's real estate representative called Hoppe's office, and left word that Shell desired to sell three "surplus" service stations in Las Vegas, describing them by location.

Subsequently, whenever Hoppe requested it, Shell's representatives supplied further information for Hoppe to use in negotiations with its prospect, Husky. Inferably, Shell's representatives knew common real estate practice is that a broker receives compensation through a percentage of the price obtained for the seller; they knew Hoppe expected to be paid; and they knew Hoppe in all likelihood expected to be paid in the customary way. Nonetheless, Shell continued to permit Hoppe to act for Shell's benefit, interesting Hoppe's prospective buyer in Shell's "surplus" service stations. Read in the light most favorable to Hoppe, as it must be, the record does not require a finding that Hoppe was merely an "officious" intermeddler, as Shell contends.

Ultimately, after determining that Shell's "surplus" stations might be acceptable to Husky, Mr. Hoppe expressly discussed price and commission with Shell's representative, Mr. Cobb. Even then, Shell failed to advise Hoppe its conduct was regarded as "officious." Rather, Mr. Cobb told Mr. Hoppe he would recommend to higher Shell authority a price between $250,000 and $260,000. Moreover, Cobb clearly led Mr. Hoppe to understand that his company could earn a commission by producing a buyer willing to pay a "net" price acceptable to Shell plus Hoppe's customary commission.[1] On this basis, Hoppe continued to work on Shell's behalf, rather than endeavoring to interest Husky in other listings.

Having been led to understand Shell would pay a commission if he produced a buyer at a gross price covering Shell's desired

---

[1]After determining from Mr. Cobb the price Cobb would submit for final approval, Mr. Hoppe testified, he specifically addressed the issue of Hoppe's compensation:

"Q. Was anything else said by you and Mr. Cobb on that occasion?
"A. Yes. I asked him if that price included commission.
"Q. What did he say to you?
"A. He said, 'Shell doesn't like to pay a commission.' I said, 'Well, you mean it's got to be net to you, then?' And he said, 'That's right.'
"Q. Was anything else said?
"A. Yes. He told me that this, of course, was not a firm figure. Nothing that I could go in and say, 'This is it,' but he merely stated that he would recommend acceptance of a price in this range."

"net" plus the commission, Mr. Hoppe estimated and quoted to Husky the expected gross price of $275,000. He computed that figure by increasing Shell's expected high "net" figure, $260,-000, by six percent rounded off at $15,000. (Testimony indicates a six percent commission is customary in Las Vegas, for similar brokerage services.) Then Mr. Hoppe wrote Husky, advising that the "surplus" stations could probably be purchased for a total price of $275,000, and at the same time forwarded information received from Shell concerning storage and sales volume, pictures of the stations, and other data.

Shortly thereafter, Shell's representatives arranged a meeting with Husky's agents. There, they contracted a sale to Husky for $275,000, without further assistance from Hoppe. At that time, Husky's representative, Gregson, expressly told Shell's representatives that William Hoppe had interested them in the stations. However, Shell's agents assured Gregson that Hoppe had no rights.[2]

Whether the trial court erred in finding Shell may not take the benefits of Hoppe's services, and retain for itself the $15,000 included for Hoppe's fee in the $275,000 gross sales price, is the ultimate question before us.

1. Of course, before a real estate agent is entitled to a commission, an employment contract must be shown, Lawry v. Devine, 82 Nev. 65, 410 P.2d 761 (1966), and the agent must have been the "procuring cause" of the sale. Humphrey v. Knobel, 78 Nev. 137, 369 P.2d 872 (1962). Cf. Brewer v. Williams, 362 P.2d 1033 (Colo. 1961).

To support its contention that the evidence does not show a broker-client contract, Shell relies on Lawry v. Devine, cited above, in which a trial court determined no agreement had been reached. Obviously, this case is in a totally different posture. Here, the district court found an employment relationship between Hoppe and Shell, and we cannot disturb that determination unless it is clearly erroneous. NRCP 52(a).

---

[2]Gregson testified:

"A.    I said, 'Well, I just want to make sure you know that I saw those stations with Bill.'

"Q.    And he said—

"A.    He said, 'That's fine. We don't pay commissions. He didn't have the authority to sell it.' I said, 'Just so the record is clear, I want you to know I saw them.'

"Q.    And then he said to you, 'And we'll cross that bridge when we come to it if there is any problem.'

"A.    Yes."

"Net listing" brokerage agreements are, of course, fairly common contractual devices, generally enforceable according to their tenor. Humphrey v. Knobel, 78 Nev. 137, 369 P.2d 872 (1962); Close v. Redelius, 67 Nev. 158, 215 P.2d 659 (1950); and Ramezzano v. Avansino, 44 Nev. 72, 189 P. 681 (1920). If satisfactory to both parties, as the trial court here found it was, we perceive nothing objectionable as a matter of law in a "net listing" agreement reserving to a higher company official, other than the one engaging the broker, ultimate power to decide what "net" figure is reasonable and sufficient. True enough, the seller's implied obligation to act in good faith might be difficult to enforce; however, if some preclusive legal objection exists to such a contract, the brief of appellant Shell omits to note its nature.

2. The record obviously justifies a finding that Hoppe was the "procuring cause" of the sale. "It is impossible to measure in quantitative units the efforts necessary to constitute 'procuring cause.' Suffice that on the one hand it is 'conduct that is more than merely trifling.' " Bartsas Realty, Inc. v. Leverton, 82 Nev. 6, 9, 409 P.2d 627, 629 (1966). The evidence consistently shows Hoppe brought buyer and seller together.

3. Concerning Hoppe's appeal from denial of relief against Husky, we agree with the district court, that there is insufficient evidence to establish a commission liability on the part of Husky.

These appeals are affirmed.

ZENOFF, MOWBRAY, and THOMPSON, JJ., concur.

BATJER, J., concurring in part and dissenting in part:

I respectfully dissent from that part of the majority opinion which affirms Hoppe's judgment against Shell, but concur in that part of the majority opinion affirming the judgment in favor of Husky and against Hoppe. Viewing it in its most favorable light, the evidence which purports to support the trial court's finding fails to establish a brokerage contract between Hoppe and Shell.

Hoppe had one direct contact with Shell. That was "about a five minute" conversation with a representative of Shell whose name he could not remember and whose recommendation

Hoppe admitted would have to be approved by higher authority. During the brief telephone conversation Hoppe inquired about the sale price on the property in which the prospective buyer Husky was interested and was told by Shell's representative that in his personal opinion the price should be between $250,000 and $260,000. Hoppe then inquired if that price included a commission. "Shell doesn't like to pay a commission" was the representative's answer. Hoppe then responded, "Well, you mean it's got to be net to you, then?," and the representative said "that's right". After that conversation Hoppe sent an unanswered letter to Shell, and advised Husky that the sale price on the desired property was $275,000. Subsequently Husky purchased the property directly from Shell. Upon Shell's refusal to pay a commission Hoppe sued claiming a $15,000 fee.

If Hoppe had an intention of holding Shell to an employment contract he should have had something more definite than his own inference that Shell was agreeing to employ him and pay a commission simply because Shell's employee with whom Hoppe had the telephone conversation did not advise him in a harsh manner that it would not do so. It is not contended by Hoppe that he had any further conversation or negotiations with Shell other than an unanswered letter which he sent to that company.

Real estate brokers' employment contracts are to be treated in the same manner as other contracts. There must be a meeting of the minds, consideration, mutuality and certainty. Here there was no meeting of the minds or mutuality because it was never Shell's intention to hire Hoppe and their employee told him so, albeit in a polite manner. To allow Hoppe to recover one penny as a commission in this case will make it possible for a broker, upon the flimsiest assumption of consent, to foist his services upon a property owner and extract a commission.

Assuming, without conceding that Hoppe was the procuring cause in the Husky-Shell land transaction, he had no right to act in that capacity. In Zeligson v. Hartman-Blair, Inc., 135 F.2d 874, 875 (10th Cir. 1943), that court said: "It is a well settled principle of law, which needs no citation of authority to support it, that where an owner, in response to an inquiry from a broker, merely states the terms upon which he is willing to sell his property, he does not become liable for a commission if the broker produces a purchaser. Under such circumstances, the broker is a mere volunteer and the owner owes him no duty whatsoever." Cf. Ira Garson Realty Co. v. Brown, 4 Cal.Rptr. 734 (Cal.App. 1960); Bennett v. H. K. Porter Company, Inc., 301 N.E.2d 155 (Ill.App. 1973). O'Donnell v. Carr, 126

S.E. 112, 114 (N.C. 1925). See also 12 C.J.S. Brokers, Sec. 60, p. 134.

A real estate broker seeking a commission has the burden to sustain the action by clear and convincing evidence. I can find no evidence in this record to support an employment contract · and I would reverse and instruct the district court to enter a judgment in favor of Shell and against Hoppe. See Johns v. Ambrose-Williams & Co., 317 P.2d 897 (Colo. 1957).