*941
 
 OPINION
 

 Per Curiam:
 

 Respondent Phyllis Coliman was employed as a real estate broker by appellant Jack Matthews (“Matthews”) and his real estate company, appellant Jack Matthews & Company (“Matthews & Co.”). While so employed, Coliman assisted in procuring and negotiating the sale of a valuable commercial site partially owned by Matthews. Coliman believed that she was acting on Matthews’ behalf, as the seller’s agent, in this transaction and was entitled to a commission. Matthews believed that Coliman was acting on behalf of the buyer in the transaction and did not believe he or his company was obligated to pay her a commission. The district court found that Coliman was acting as Matthews’ agent, at least impliedly, and was entitled to the reasonable value of her services; it also found that Coliman had reached an accord and satisfaction with appellants as to the amount she would receive. Appellants agree that such an accord was reached, but disagree with the district court as to its terms. Appellants also challenge the award of attorney’s fees and costs to Coliman.
 

 We conclude that the district court erred in finding an accord and satisfaction, and that Coliman was entitled to be paid the reasonable value of her services.
 

 FACTS
 

 Coliman filed her action against Matthews and Matthews & Co., alleging breach of contract and of fiduciary duties in refusing to pay Coliman a real estate commission. Matthews is the owner and president of Matthews & Co., a Nevada real estate firm which has been in business since 1969. Coliman obtained her Nevada real estate broker’s license in 1988, and in January of
 
 *942
 
 the same year, entered into an “Independent Contractor Agreement” with Matthews & Co. The contract was a form appearing on Matthews & Co. letterhead and contained an attachment setting forth the graduated commission rate schedule under which Coliman would be operating as an independent contractor.
 

 In October of 1988, as a result of an advertisement that Coliman was running, she was contacted by a broker, Jack Haddock, who later put her in contact with broker Bert Jakobson, whose clients were interested in purchasing a commercial property site in Reno. Coliman had earlier been informed by the commercial manager for Matthews & Co. that the Smithridge Financial Plaza, in which the Matthews & Co. offices were located, was available for sale. Coliman was thus prompted to ask her superior, Gene Milligan, to contact Matthews for permission to show the site. The Smithridge Plaza was owned by Matthews and Monroe Schneider, as M&S Investments, a general partnership. Coliman testified that Milligan reported to her that the site was still for sale, the price and other conditions of sale, and that the commission had been set by Matthews at 8 percent.
 

 Matthews testified that at the time he relayed this information to Milligan, Milligan informed him that Coliman was working with a broker that had an interested buyer, but that he and Milligan did not discuss Collman’s status as a listing agent. Matthews noted that neither he nor Schneider had approached Coliman about selling Smithridge on behalf of M&S and that Coliman never discussed or executed any formal listing agreement or brokerage fee agreement with M&S regarding the sale. Matthews assertedly believed that Coliman and Jakobson were working together on the buyer’s behalf.
 

 Jakobson’s client, Harold Moates, offered 1.5 million dollars for Smithridge against the original asking price of 1.7 million. Eventually, the offer was raised to 1.6 million, and, in order to facilitate a sale, Jakobson and Coliman decided to lower their commission to 6 percent, thus increasing the sellers’ margin of profit. Jakobson and Coliman intended to evenly split the 6 percent commission.
 

 Coliman sent a letter to Matthews and Matthews & Co., dated November 8, 1988, attached to the 1.6 million-dollar offer, explaining the terms of the offer and noting the brokers’ voluntary reduction of the commission. The offer attached to the letter, termed an “Agreement of Sale and Deposit Receipt,” appeared on Jakobson Investment Corporation letterhead. The offer was signed by Jakobson on behalf of Jakobson Investment Corporation, as agent for the buyer, as well as Harold Moates, the buyer.
 
 [1]
 
 
 *943
 
 Additionally, the document was signed by Coliman, who assert-edly believed she was signing it as a listing agent for Matthews. According to Matthews, the offer identified Coliman as the buyer’s agent. Our review of the document reveals that Collman’s signature appears after the typed language: “Jack Matthews By/” although it also appears before that portion of the document entitled “acceptance,” thus lending some credence to both parties’ version of the instrument. The document specified $96,000.00, or 6 percent of the sales price, as the brokerage fee.
 

 Coliman later prepared a counter offer dated December 12, 1988, which was signed by the owners, Matthews and Schneider. Coliman is listed in this instrument as the person to whom acceptance of the counteroffer should be communicated as follows: above the phrase “(LISTING AGENT’S NAME)” appears the language, “Phyllis J. Coliman, JACK MATTHEWS & COMPANY, INC., the agent of Ownerf.]” Collman’s signature also appears as a witness and “agent” of the sellers on an addendum to the counteroffer. The addendum was executed “for Jack Matthews” by one Mark Wildes, whom Matthews acknowledged was authorized to sign on his behalf. Matthews testified that he signed the December 12 counteroffer, but did not pay any attention to the fact that Collman’s name appeared thereon as his listing agent. Coliman testified that she was never informed by Wildes, Matthews or Schneider that the references to her in these documents were incorrect.
 

 On January 3, 1989, the sellers accepted the November 8, 1988, offer. Specifically, the “Acceptance” portion of the offer was signed by Matthews and Schneider, but the $96,000.00 brokerage fee was lined through by Matthews, with a note that the fee would be established by separate agreement.
 

 Pursuant to this separate agreement, Matthews and Schneider reduced the brokerage fee from 6 percent ($96,000.00) to 4 percent ($64,000.00), with provision for Jakobson to receive his 3 percent ($48,000.00), and the remaining 1 percent ($16,000.00) to be split between Matthews & Co. and Haddock (as a finder’s fee). When this arrangement was communicated to Milligan, he asked Matthews what was to become of Collman’s interest. Matthews replied that he assumed that Jakobson would pay her, that the property was his, and that “[t]here is no way in the world I would put her on as a listing agent to list my property.” Matthews testified that he only then realized that Coliman believed she was entitled to a listing commission as an agent for the sellers. Matthews assertedly believed that Coliman was working with the buyer, since her name appeared on an offer
 
 *944
 
 form and she had no written listing agreement, as required by written company policy. Accordingly, a dispute then arose between Matthews and Coliman regarding Collman’s right to a commission.
 

 Matthews offered, and Coliman rejected, the $8,000.00 in commission that Matthews & Co. allegedly had remaining. On February 2, 1989, Coliman corresponded with Milligan, stating in relevant part:
 

 I have re-thought my position on the situation concerning the [Smithridge] property. I
 
 have not
 
 changed my position, I
 
 do not
 
 want the $8,000 that was offered by Mr. Jack Matthews. I am requesting that Mr. Matthews authorize my commission split position to be 90%/10%, sales agent split/broker split, effective immediately and effective for the remainder of 1989. The 90%/10% split is the level I would have been following the close of escrow on the Smithridge Financial Plaza. I want Mr. Matthews to put this authorization into writing and on my desk
 
 before
 
 the close of escrow.
 

 I believe that Mr. Matthews was remiss in his responsibility both as my broker and as the principle [sic] in the above referenced property. I once again draw your attention to both the original Agreement of Sale and Deposit Receipt and especially the Counter Offer signed by both Mr. Matthews and Mr. Schneider which specifically states that I was the the [sic] listing agent.
 

 I have sent a letter to First Commercial Title, Inc. . . . releasing both my legal and fiduciary responsibilities to both Mr. Matthews and Mr. Schneider. . . .
 

 Coliman testified at trial that this letter was not meant to give up anything, but was meant to convey that she had earned her full commission on the Smithridge transaction, and was also entitled to a 90-10 split for the rest of the year. This testimony appears consistent with the language of the letter, which stated that while Coliman had “rethought” her position, she had ultimately “not changed” it.
 

 The contract under which Coliman was originally employed by Matthews & Co. stated that the scale of commission would be graduated based on net commissions received by the agent. The contract specified that after agents had earned commissions totaling $25,001.00 or more, they would earn a commission of 90 percent. Thus, Coliman apparently felt she had reached the level of eligibility for a 90 percent commission share through the Smithridge sale.
 

 Matthews assertedly believed that Collman’s letter constituted an “alternative” or counteroffer with which she would be happy,
 
 *945
 
 i.e., getting a 90 percent commission for the remainder of the year in lieu of getting her desired commission on the Smithridge sale. By letter dated February 9, 1989, Matthews acknowledged that Matthews & Co. would pay Coliman on a 90 percent basis for any future recordings that year, believing this would resolve the issue. According to Matthews, Coliman did receive a 90 percent commission split on at least one subsequent closing. The Smithridge Plaza sale closed on February 15, 1989, and Coliman later terminated her affiliation with Matthews & Co. In November of 1989, Coliman filed her action and the matter later proceeded to trial.
 

 The district court filed its “Decision” on February 19, 1991, and its Judgment on March 27, 1991. The court determined, as explained in its Decision, that Coliman “was acting as a listing agent for the seller at the time she facilitated the sale of [the] Plaza.” This conclusion was based on: Matthews’ actions in informing the commercial manager of Matthews & Co. that the property was still available for sale; executing documents which disclosed Collman’s “representative capacity as the agent for the owner;” and not fulfilling his “duty to himself and his partner” as Collman’s employer “to make it clear to [Coliman] that the opportunity he made known through his real estate firm would not admit to agency relationship.”
 

 Accordingly, the court determined that “either under principles of estoppel or quasi-contract, the Plaintiff is entitled to the reasonable value of her services for having secured a purchaser and making the sale of a property possible[.]” The court calculated the value of Collman’s entitlement at $25,500.00,
 
 [2]
 

 “unless
 
 she bargained away her claim prior to the close of escrow.”
 

 The district court proceeded to find that Collman’s letter of February 2, 1989, proposing a 90/10 split and releasing her legal and fiduciary responsibilities to Matthews and Schneider, legally conveyed a willingness to accept a lesser amount to resolve a disputed claim, even if that was not her actual intent. The court determined that this letter and Matthews’ response agreeing to the arrangement constituted an offer and acceptance forming a bind
 
 *946
 
 ing and enforceable accord and satisfaction. The court then concluded:
 

 A finding of an enforceable accord and satisfaction, however, has an interesting application in this case, and one which may be altogether unexpected from Mr. Matthews’ standpoint as well. The offer which Mr. Matthews accepted, clearly states that the 90/10 split would be “effective immediately”, both in the first paragraph and the last paragraph. At the time the Smithridge transaction was still pending close of escrow. The actual broker’s commission for the seller at [Matthews & Co.] was $16,000.00. Ninety percent (90%) of that figure is $14,400.00. Under [the original employment contract] there is a $50.00 manager’s override fee, so that net commission due Phyllis Coliman b[y] [Matthews and Matthews & Co.] is the sum of FOURTEEN THOUSAND THREE HUNDRED FIFTY DOLLARS ($14,350.00).
 

 A judgment in this amount, together with $10,687.23 in attorney’s fees and $834.70 in costs (for a total award of $25,871.93), was accordingly entered on Collman’s behalf. Matthews now appeals.
 

 DISCUSSION
 

 Although Matthews agrees with the district court’s finding of an accord and satisfaction, he disagrees with the court’s findings concerning its terms. Matthews contends that the terms of the accord and satisfaction were that Coliman would receive a 90 percent split on all future transactions in return for releasing her claim to any commission on the Smithridge sale, and that there is insubstantial evidence to support the district court’s version of the parties’ agreement. Alternatively, Matthews suggests that even if the district court’s interpretation were to be viewed as correct, Collman’s 90 percent share in the Smithridge sale should have been applied to $8,000.00 rather than $16,000.00. Matthews contends that the district court overlooked the fact that Matthews & Co. paid one-half of its $16,000.00 commission to Haddock as a cost of sale.
 

 Although Collman’s position on appeal is that the damage award she received was supported by substantial evidence, at oral argument her counsel acknowledged that there was no real meeting of the minds as to the terms of an accord and satisfaction. Coliman also insists that applying her 90 percent share to a net commission of $8,000.00 would be unreasonable because Matthews had unilaterally reduced Matthews & Co.’s share to that amount. Moreover, she notes that an award of less than
 
 *947
 
 $8,000.00 to her would mean that she had rejected Matthews’ $8,000.00 settlement offer in return for an accord and satisfaction entitling her to less than $8,000.00.
 

 Our review of the record persuades us that the district court erred in finding an accord and satisfaction. In Morris DeLee Family Trust v. Cost Reduction Eng’g, Inc., 101 Nev. 484, 486, 705 P.2d 161, 163 (1985), we stated:
 

 [A]n accord and satisfaction should not be maintained as a “pitfall into which the unwary may fall by some act wholly unintended to express his acquiescence in a transaction, wherein his lack of experience or lack of knowledge of technical law might debar him from a right of action.” Western Nat’l Ins. Co. v. Trent, 69 Nev. 239, 244, 247 P.2d 208 (1952), citing Wolf v. Humboldt County, 36 Nev. 26, 131 P. 964 (1913).
 

 A finding of an accord and satisfaction requires a “meeting of the minds” of the parties
 
 on the terms
 
 of the agreement. Pederson v. First Nat’l Bank of Nevada, 93 Nev. 388, 392, 566 P.2d 89 (1977); Wolf v. Humboldt County,
 
 supra
 
 36 Nev. at 31, 131 P. at 965. It can never be implied from language of doubtful meaning.
 
 It must clearly appear from the evidence that there was in fact and in reality a meeting of the minds
 
 before we will consider an agreement an accord and satisfaction. Adelman v. Arthur, 83 Nev. 436, 433 P.2d 841 (1967).
 

 (Emphasis added.)
 

 As noted above, a prerequisite for the finding of an accord and satisfaction is a clearly established meeting of the minds. The evidence in the instant case reflects no such meeting of the minds. The parties testified differently concerning the meaning of the agreement to grant Coliman a 90/10 split on future commissions and the manifest differences in the views of the parties have continued unabated on appeal. Indeed, even the district court’s decision reflects a recognition that no meeting of the minds occurred:
 

 In reaching and applying these principles ... the Court is fully aware that it is rejecting in part both the interpretation which the Plaintiff gives to her letter of February 2nd . . . and the interpretation which Mr. Matthews gives to his acceptance of the offer contained in his letter of February 9th[.j
 

 [Collman’s letter] legally convey[ed] a willingness to
 
 *948
 
 accept a lesser amount to solve a disputed claim[] [e]ven if that was not her actual intent ....
 

 A finding of an enforceable accord and satisfaction . . . has an interesting application . . . which may be altogether unexpected from Mr. Matthews’ standpoint as well.
 

 Thus, the district court determined that there was an accord and satisfaction despite the fact that its terms were unknown by, and contrary to, the intent of both parties. Unfortunately, the law demands clear evidence that “in fact and in reality,” the minds of the parties met and agreed on the terms of an accord and satisfaction before a court may find that such an agreement was reached.
 
 [3]
 

 On the other hand, the trial evidence certainly supported the finding by the district court that Coliman was acting as an agent for Matthews, at least impliedly, and that she therefore was entitled to the reasonable value of her services. The factors enumerated by the district court, such as Matthews’ execution of documents listing Coliman as his agent, provide sufficient factual support for such a finding. This court has long recognized that, absent an express listing agreement, a broker may nevertheless be entitled to the reasonable value of his or her services rendered in procuring a sale where the facts support a theory of implied contract, or quantum meruit. For example, in Atwell v. Southwest Securities, 107 Nev. 820, 823, 820 P.2d 766, 768-69 (1991), we stated:
 

 The requirement that an employment contract be found to exist is easily met. In [Morrow v. Barger, 103 Nev. 247, 252, 737 P.2d 1153, 1156 (1987)], this court held that “[a] promise to pay the reasonable value of services may be implied, and a real estate agent may recover under the theory of
 
 quantum meruit
 
 . . . .” Implied employment contracts between sellers and brokers have been found to exist with only moderate factual support. For example, in [Shell Oil Co. v. Ed Hoppe Realty Inc., 91 Nev. 576, 580-81, 540 P.2d 107, 109-10 (1975)], this court held that an employment contract could be found to exist where the only evidence of a
 
 *949
 
 contract consisted of letters sent by the broker to the seller and price information received in return. The court noted that the seller was aware of common real estate practice and knew that the broker expected to be paid, and that the seller continued to permit the broker to act on the seller’s behalf, in reliance detrimental to his own interest.
 
 Id.
 
 at 579, 540 P.2d at 108-09.
 

 See also
 
 Bangle v. Holland Realty Inv. Co., Inc., 80 Nev. 331, 393 P.2d 138 (1964) (broker who procured home sales with owner’s knowledge and acquiescence and who had no exclusive listing agreement with owner could recover from owner in quantum meruit for reasonable value of services).
 

 Based upon the evidence of record and the law cited above, we conclude that there was no accord and satisfaction, but that Coliman was entitled to the reasonable value of her services, which was calculated at $25,500.00.
 

 We note that our decision awarding Coliman an amount greater than $20,000.00 may preclude her from receiving an award of attorney’s fees since the stated authority for the award was NRS 18.010
 
 [4]
 
 However, Coliman is not precluded from recovering her costs, which were awarded below; nor would she be precluded from recovering attorney’s fees if the same were found to be recoverable under some other theory.
 

 Matthews’ claim that Coliman was precluded from recovering costs and attorney’s fees due to the provisions of NRCP 68 and NRS 17.115 is without merit. NRCP 68 provides, in relevant part, that where a pretrial offer of judgment is made and rejected, “[i]f the judgment finally obtained by the offeree is not more favorable than the offer [of judgment], the offeree shall not recover costs, nor attorneys’ fees[.]” NRS 17.115 provides a
 
 *950
 
 similar rule and also precludes the offeree from obtaining prejudgment interest.
 

 In the present case, Coliman extended a pre-trial offer of judgment to Matthews to allow judgment to be entered in her behalf in the amount of $25,500.00. Matthews rejected the offer and now relies on NRCP 68 and NRS 17.115 for the proposition that it was an abuse of the district court’s discretion to award Coliman her costs and attorney’s fees. Matthews reasons that because the amount of the judgment Coliman received was less than the amount of the offer of judgment (or, given our present ruling, was not “more favorable” than the offer of judgment), attorney’s fees and costs are unavailable to Coliman.
 

 Matthews overlooks the fact that Coliman was the offeror and Matthews was the offeree. Coliman, as offeror, can not have her claim for costs and attorney’s fees defeated under either NRCP 68 or NRS 17.115. The preclusive aspect of these rules apply where pre-trial offers of judgment are made by defendants and received by plaintiffs (the party who may obtain a judgment at trial).
 
 [5]
 
 In the instant case, the opposite scenario occurred and the preclusive rules concerning fees and costs are simply inapplicable. Nevada’s version of Rule 68, unlike its federal counterpart, allows either party to make an offer of judgment, rather than giving the option only to the defendant; both rules, however, contain identical language barring
 
 only
 
 the non-accepting offeree from obtaining costs and attorney’s fees.
 

 Not only is the result sought by Matthews barred by the plain terms of the rule and statute relied on, but it is also antithetical to the purposes behind the rules. NRCP 68 and NRS 17.115 are designed to facilitate and encourage settlement.
 
 See
 
 Morgan v. Demille, 106 Nev. 671, 674, 799 P.2d 561, 563 (1990). They do so by placing the risk of loss on the non-accepting offeree, with no risk to the offeror, thus encouraging both offers and acceptance of offers. Placing the risk of loss of eligibility for fees and costs on an offeror, as Matthews would have us do, would have the opposite result and would discourage plaintiffs from making offers to settle. Such a result would attenuate Nevada’s policy of encouraging both parties to make pre-trial settlement offers, as illustrated by our rule’s specific departure from the unilateral federal model.
 

 CONCLUSION
 

 For the reasons discussed above, the judgment entered below is vacated, and the matter is remanded to the district court with
 
 *951
 
 instructions to enter judgment in favor of Coliman in the amount of $25,500.00, together with such costs, fees, and interest which the district court may determine are warranted by law or by the exercise of the district court’s discretion.
 

 [1]
 

 This document and other trial exhibits referred to in the parties’ briefs were not made part of the record on appeal. For purposes of verification, we
 
 *943
 
 elected to contact the Washoe County Clerk for copies of all the exhibits admitted at trial.
 
 See
 
 NRAP 10(g).
 

 [2]
 

 The court determined that it was clearly within the contemplation of the parties during negotiations that 6 percent, with 3 percent for the buyer’s broker and 3 percent for the seller’s broker, might be a reasonable fee. The $25,500.00 figure was then calculated by applying the graduated fee schedule attached to Collman’s original employment contract to $48,000.00 (or 3 percent of $1,600,000.00) minus the $8,000.00 finder’s fee. This amount corresponded with the computation by Coliman concerning her entitlement under the schedule. Although the district court found the graduated fee schedule ambiguous in application, it noted that both parties interpreted the schedule in the same manner.
 

 [3]
 

 This is not to say that a district court may never find the existence of a viable accord and satisfaction where the parties contest its terms at trial. It may be that other evidence will support a trier of fact’s finding that the parties did in fact and in reality reach a meeting of the minds as to the terms of an accord and satisfaction despite contradictory testimony by the parties. In such a case, the district court’s options are in no way limited by our instant ruling. Here, however, the district court indicated that neither party originally understood the terms and effects of the agreement they allegedly reached, but imposed an accord and satisfaction upon them anyway.
 

 [4]
 

 NRS 18.010 provides, in pertinent part:
 

 18.010 Award of attorney’s fees.
 

 2. In addition to the cases where an allowance is authorized by specific statute, the court may make an allowance of attorney’s fees to a prevailing party:
 

 (a) When he has not recovered more than $20,000; or
 

 (b) Without regard to the recovery sought, when the court finds that the claim, counterclaim, cross-claim or third-party complaint or defense of the opposing party was brought without reasonable ground or to harass the prevailing party.
 

 Although the judgment appealed from does not expressly designate which section of the foregoing statute was relied upon, it would appear that the award arose out of the court’s discretionary powers under section (2)(a).
 

 [5]
 

 Of course, counterclaimants and parties with cross-claims would also fit within the rules pertaining to offerees with a potential for an award of damages.